**UNITED STATES of America**

v.

**Benjamin T. THORNTON, Appellant.**

**No. 84–5190.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1984.

Decided Oct. 12, 1984.

Stephen H. Glickman, Washington, D.C., with whom Roger E. Zuckerman, Washington, D.C., was on the brief, for appellant.

Joan C. Barton, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Thomas J. Tourish, Jr., and Paul L. Knight, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, and MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is an appeal by Benjamin Thornton from his conviction, following a jury trial, for possession of narcotics with intent to distribute in violation of 21 U.S.C. § 841(a). In his appeal, Mr. Thornton maintains that he was improperly denied the benefit of an instruction to the jury for the lesser included offense of mere possession of narcotics. He also contends that the District Judge was biased and prejudiced against him so as to deprive him of a fair trial; that the searches resulting in the seizure of heroin and narcotics paraphernalia were violative of the Fourth Amendment; and that the District Court erred by reviewing a presentence report with respect to an earlier conviction of Mr. Thornton. For the reasons that follow, we affirm.

## I

### A

This case arose out of a gambling investigation conducted by officers of the Metropolitan Police Department of the District of Columbia ("MPD") and the Prince George's County, Maryland, Police Department during the months of February and March 1983. Police suspected that appellant, a resident of Maryland, who had previous arrests and one conviction for gambling violations, and his daughter, who had one previous arrest for gambling violations, were operating a lottery or "numbers game" out of three locations in the District of Columbia: 1265 Simms Place, N.E., Apartment 21; 1270 Simms Place, N.E., Apartment 2; and 55 P Street, N.W.

The three locations were placed under surveillance beginning the first week of February 1983. During eleven days of surveillance of the two apartments on Simms Place, appellant was observed entering or leaving one or both of the apartments on six different dates. Appellant's daughter was seen on the 1200 block of Simms Place more frequently. On several occasions, appellant or his daughter was observed moving back and forth between the two Simms Place apartments. Most of these observations by police officers took place between 11:00 a.m. and 5:00 p.m., which is considered the prime period of time for illegal gambling.

A critical event during this period of surveillance occurred on February 7, 1983, when appellant was observed leaving 1270 Simms Place and walking to 1265 Simms Place. Shortly afterward, he left 1265 Simms Place carrying a white plastic garbage bag. Mr. Thornton then walked to the rear of 1265 Simms Place and deposited the garbage bag in a trash can, which was actually an oil drum the lid of which had been cut off. This trash can was one of several oil drums located in an alley behind the building at 1265 Simms Place, adjacent to a garage situated on another lot. After observing appellant's activities in this respect, MPD officers, unbeknownst to Mr. Thornton, removed the bag from the trash can and discovered that it contained gambling paraphernalia, namely numbers work and "run-down" tapes.

On March 3, 1983, the police obtained a court order authorizing the installation of pen register devices on the two apartments at 1265 and 1270 Simms Place. These devices, when attached to the telephone lines of the apartments, register the time and day of any telephone calls received by, and the time, day, and phone number of any calls made from the apartments. The pen registers showed that from March 7 to March 19, fifty-one calls were made from 1265 Simms Place and 1270 Simms Place to 55 P Street, and most of these calls took place within one hour of the prime gambling period.

In addition to the events at Simms Place, the surveillance of 55 P Street, N.W., conducted on two days in March 1983, likewise yielded relevant information. Police observed a fairly large number of people entering and exiting the house. On March 15, twenty-four people entered 55 P Street between 12:20 p.m. and 3:00 p.m.; on March 16, fourteen people entered between 12:45 p.m. and 4:10 p.m. These people were admitted either by someone on the inside of the house who would unlock the iron door, or by a man standing outside with a key. Many of the visitors to the house carried bags inside, but did not have the bags when they left.

The surveillance at the three locations, the items found in the trash can, and the results of the pen registers led the police to conclude that appellant's daughter was accepting wagers over the telephone at 1265 Simms Place, that wagers were physically turned in at 55 P Street, and that records and money were kept at 1270 Simms Place. On March 21, 1983, members of the MPD gambling squad applied for seven search warrants—one for 1265 Simms Place, one for 1270 Simms Place, one for 55 P Street, three for automobiles that appellant or his daughter had been seen driving, and one for appellant's person.

The search warrants were executed on March 28, 1983. The task of searching the apartment at 1270 Simms Place fell to two MPD gambling squad detectives accompanied by several uniformed officers. At ap-proximately 3:15 p.m., the detectives knocked loudly on the door of Apartment 2 at 1270 Simms Place, as one of the detectives shouted, "Police officers. We have a search warrant." When no response was forthcoming, the officers twice more knocked and announced their presence. There was still no response, and the police officers thereupon broke open the door with a battering ram. According to the officers' testimony, approximately twenty-one to thirty seconds had passed between the time they first knocked on the door and the time they entered the apartment.

As the first officer entered the apartment, he saw Mr. Thornton in the middle of the apartment, walking toward the living room. The officer also heard the sound of a toilet flushing. Going directly to the bathroom, the officer saw water swirling in the toilet bowl. He stuck his hand down into the toilet and pulled out a plastic bag containing a dark brown liquid that was later identified as containing traces of heroin and quinine, a chemical often used in diluting heroin for street sale.

The officer proceeded to search the rest of the apartment. On a dinette table across from the bathroom, he found a record album with traces of powder on it (the powder was later identified as containing traces of heroin), measuring spoons, a playing card, and a yellow plastic container with a powder inside it which was later identified as quinine. The measuring spoons and playing card were later found to have on them traces of heroin and cocaine.

The officer then returned to the bathroom for a more thorough search of that room. He saw there a jalousie window near the ceiling above the toilet. The window opened upon a bricked-up air shaft. Outside the window, just below the window ledge, was a wooden platform that extended across the width of the window. By standing on the lid of the toilet, the officer could see a bag of powder about a hand's depth from the window ledge. From this position, the officer reached up and removed the bag from the platform. The

bag was later found to contain four ounces of hydrogen hydrochloride (heroin) of approximately forty percent purity, with a retail or "street" value of approximately $150,000 and a wholesale value of $44,000.

The second officer, meanwhile, discovered during the search rubber gloves and surgical face masks in a potato chip box on the stereo.[1] The gloves had traces of quinine on them. In a drawer in the kitchen table were a large number of small plastic bags, the size often used to package heroin for street sale. A device for closing and sealing plastic bags was situated near the dinette table. In a paper bag in a closet just off the dining room was a cannister containing a powder subsequently identified as mannitol, which like quinine is often used in the preparation of heroin for street sale. In the bedroom, in plain view, were narcotic "cookers" (devices used to prepare drugs for injection), and several syringes, needles, and plungers, each of which contained traces of heroin, cocaine, or quinine.

Not only narcotics and related paraphernalia, however, were seized during the search. Gambling paraphernalia were also seized in the apartment. Specifically, "rundown" tapes were found in the kitchen trash; in addition, in the front living room closet was a suitcase that contained numbers work and an adding machine.

Finally, hanging from the lock of the apartment door was a set of keys. One of the detectives testified that Mr. Thornton acknowledged that the keys belonged to him.

Meanwhile, other search warrants were being executed. Police officers knocked on the door of the apartment at 1265 Simms Place and announced their presence. No battering rams or other extraordinary devices had to be employed in this instance, however, as the door was promptly opened by appellant's daughter. The ensuing search of that apartment turned up quantities of quinine and mannitol, and small glassine bags, as well as personal papers of

Charles Thornton, appellant's nephew, who, as we shall presently see, figures large in appellant's case. One of the automobiles contained electric and gas bills for the 1270 Simms Place apartment and an electric bill for the 1265 Simms Place apartment. A search of appellant's Maryland residence by members of the Prince George's County Police Department revealed a lease for the 1265 Simms Place apartment.

A grand jury returned an indictment on August 2, 1983, charging Mr. Thornton with possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a). On December 1, 1983, a superseding indictment was returned charging appellant with a violation of 21 U.S.C. § 841(a), and with operating a lottery in violation of 22 D.C. Code § 1501.

B

Appellant moved in December 1983 for severance of the two charges. The motion was granted on January 26, 1984, so that the case as tried to the jury was solely with respect to the alleged narcotics violation. Appellant also moved in September 1983 for suppression of the evidence gathered at 1270 Simms Place, claiming that the warrant was not supported by probable cause. The District Court denied the motion.

At trial, the prosecution presented the narcotics-related evidence, including the large cache of heroin, collected during the various searches. The uncontradicted testimony before the jury was that the apartment at 1270 Simms Place was, in light of the evidence seized there and admitted at trial, being used to prepare heroin for sale on the streets. Heroin of approximately forty percent purity,[2] the testimony indicated, is simply too pure for personal use, and has to be diluted before an addict could safely inject it. According to the testimony, quinine and mannitol are commonly used as dilutants, and the dilution process is often accomplished on a record album,

---

1. The uniformed officers did not testify at trial, and the nature and scope of their activities during the course of the search are unclear.

2. Laboratory tests indicated that the heroin was 39.2% pure.

which provides a slick surface. Playing cards are often used, the testimony indicated, to mix drugs. Measuring spoons are then used to measure the diluted product into glassine bags, which are sealed for distribution and sale. A non-user of heroin engaged in such preparations would, according to the uncontradicted testimony at trial, be likely to use a surgical mask and rubber gloves to avoid ingesting the drug.

The defense, in turn, did not deny that 1270 Simms Place was being used to process drugs; instead, the thrust of the defense was that appellant had nothing to do with the narcotics. Mr. Thornton's defense was that he was a professional gambler who went to 1270 Simms Place solely for gambling purposes,[3] and that all the narcotics and narcotics paraphernalia belonged to his nephew, Charles Thornton, an admitted heroin addict who lived in the apartment.

While Mr. Thornton elected not to testify, his case was in essence a consistent attempt to prove his complete innocence of the narcotics charges, by contending that his presence at the apartment was explained solely by his gambling activities and his concern for his nephew, Charles, who had been for many years addicted to heroin. During a bench conference in the middle of his opening statement, appellant's counsel stated that "[m]y defense is that he [appellant] was engaged in the conduct [gambling] and only that conduct." Tr. at 21. In his opening statement, appellant's counsel asked the jury to ask itself at the conclusion of the trial whether the Government had proven whether the narcotics seized at 1270 Simms Place belonged not to Charles Thornton, but to appellant, a professional gambler. Tr. at 25.

When appellant's counsel cross-examined the two detectives who searched the 1270 Simms Place apartment, he asked numerous questions designed to demonstrate that appellant was operating a lottery at that location on or about the day of the search and arrest. Pursuant to defense counsel's line of questions, the detectives described the gambling paraphernalia seized at 1270 Simms Place. One of the detectives testified that the evidence indicated a gambling operation was being run from 1270 Simms Place. Tr. at 222. Appellant's counsel brought out the fact that the searches on March 28, 1983, were the results of a gambling investigation, that the search warrants were for gambling material, and that the searches were carried out by members of the gambling squad, not the narcotics unit.[4] Indeed, the *defense's* first witness was a detective who conducted the surveillance during the gambling investigation. Appellant's counsel had the detective describe the activities he observed during his surveillance, and the detective testified as to his conclusion that appellant was indeed running a gambling operation.

While advancing the proposition that Mr. Thornton was present at 1270 Simms Place only for gambling purposes, the defense also attempted to demonstrate, or at least suggest, that the drugs and drug paraphernalia found at 1270 Simms Place belonged exclusively to Charles Thornton. Defense witnesses testified that Charles Thornton resided at 1270 Simms Place, and that he was a heroin addict and had been addicted since the 1940's. The defense called as a witness a Veteran's Administration psychiatrist who testified that Charles Thornton had stated to him in January 1982 that he, Charles, supported his narcotics habit by " 'hustling and selling drugs.' " Tr. at 588. Charles did not take the stand, however, and no evidence was adduced as to Charles' financial capabilities.

Near the end of the trial, after all the evidence was in, appellant's counsel in-

---

**3.** This defense could be maintained in the narcotics trial by virtue of the fact that the gambling offense charged in the superseding indictment had been severed. Thus, in consequence of the severance, Mr. Thornton could as a practical matter interpose a "gambling defense," as it were, in the narcotics trial.

**4.** The detective who seized the plastic bag from the toilet had previously served, according to his testimony, as a member of the MPD's narcotics unit.

formed the trial court that he and his co-counsel were "in the midst of wrestling around with whether to request of the Court that it give a lesser included offense instruction, mere possession." Tr. at 670. Counsel indicated that he "suppose[d]" that there was evidence from which the jury could conclude that appellant had sufficient control over the drugs to be a possessor, but not with intent to distribute. Counsel further stated that he and his co-counsel were trying to decide whether to request the lesser included defense instruction, and would let the court know the next day.[5] *Id.* The District Judge promptly responded that he would be disinclined to give such an instruction since there was no evidence that Benjamin was a user of heroin and thus would have had no occasion simply to possess such narcotics. Appellant did in fact request the instruction the following day, and the motion was denied.

## C

Several times throughout the trial, the District Judge made statements to appellant's counsel which counsel interpreted as demonstrating the judge's bias against appellant. Most of the statements dealt with counsel's attempt to introduce evidence that appellant was engaged in running an illegal gambling operation. During appellant's opening statement, the prosecution objected to counsel's describing the evidence that a gambling operation existed at 1270 Simms Place. When appellant's counsel stated at a bench conference that part of his defense was that appellant went to 1270 Simms Place to gamble, the judge replied that "[t]he mere fact that one is engaged in one illegal activity doesn't mean he isn't engaged in two illegal activities."

Tr. at 21. The court also stated, "I am not going to let you try a gambling case in this narcotics charge." *Id.* Later in the opening argument, the prosecution objected to defense counsel's mention of the pen register devices, and, in front of the jury, the trial judge directed counsel to "[t]ry to confine it to the subject charged in this indictment." *Id.* at 23.

When appellant's counsel was cross-examining one of the detectives who searched 1270 Simms Place, the prosecutor objected to the line of questioning on gambling. The judge stated, in front of the jury, "Yes. I have pointed out to counsel that this is a narcotics case, not a gambling case." *Id.* at 151. Counsel thereupon moved for a mistrial on the grounds that this statement and others in front of the jury were prejudicial. The motion was denied, and the judge stated at a bench conference that appellant's counsel was "spending this time on something that is not a tryable [sic] issue in this case," *id.* at 152, and that "I understand [gambling] is your defense but you don't need to paper the entire walls of this courtroom with a gambling case." *Id.* When counsel stated he was doing no such thing, and that he was attempting instead to show that gambling was the reason why appellant was at 1270 Simms Place, the judge replied, "One reason." *Id.* At another bench conference during this cross-examination, the judge expressed similar concerns about spending a significant amount of time on gambling evidence. *Id.* at 157.[6]

During cross-examination of the second detective who had participated in the search at 1270 Simms Place, appellant's counsel asked the witness to describe the seized gambling items and their respective

---

**5.** Defense counsel told the court the following:

I guess, Your Honor, we are in the midst of wrestling around with whether to request of the Court that it give a lesser included offense instruction, mere possession. There is evidence from which the jury could conclude, I suppose, that the defendant was there to gamble, was not involved in any distribution but may have had sufficient dominion and control over the drugs that he was a possessor, if

not a possessor with the intention of distributing the drugs.

Tr. at 670.

**6.** The District Judge emphasized throughout the various colloquies at the bench that he had granted the defense's motion to sever the gambling charge from the narcotics count and that he would therefore not permit the narcotics trial to be turned into a trial with respect to Mr. Thornton's alleged gambling activities.

functions. After the prosecution's objection, which the District Judge sustained, the court stated in front of the jury, "the charge in this case is narcotics." *Id.* at 207. At the ensuing bench conference, Mr. Thornton's counsel stated that the gambling evidence was "a bunch of meaningless paper" unless it could be .described and explained. Still at the bench conference, the court replied, "Maybe the defense is meaningless." *Id.* at 208. Defense counsel immediately requested a mistrial, which was denied. After a recess, counsel stated to the court that he believed the judge's statement that "[m]aybe the defense was meaningless" had been heard by the jury and requested that the court *voir dire* the jury, or declare a mistrial. *Id.* at 210–11. The court denied the motions, stating, "You [appellant's counsel] are solely [sic] trying the patience of the Court as no lawyer in my experience at the bar has ever done." *Id.* at 211.[7]

At a later bench conference, appellant's counsel stated that his defense had a second prong: that Charles Thornton, not appellant, owned the drugs in question.[8] The court replied, "Hardly $40,000 worth wholesale, a man who is a street bum." *Id.* at 219. There is no contention that this comment was overheard by the jury.

At the conclusion of the trial, appellant submitted a jury instruction that outlined his theory of the case.[9] The court stated it would give that instruction only with the addendum that in evaluating the alleged ownership of heroin by Charles Thornton, the jury "may consider the evidence in the case relevant as to whether [Charles Thornton] had the financial resources to purchase a quarter pound of heroin of 40 percent purity, the wholesale value of which was estimated to be $44,000." *Id.* at 673. Appellant's counsel replied that no evidence had been presented as to Charles

7. Over the prosecution's objection, the defense was allowed, as we have seen, to present evidence *tending to show that appellant was running a gambling operation at 1270 Simms Place. See supra* page 44.

8. Another incident of which appellant complains occurred during examination of appellant's first witness (the MPD officer who participated in the Simms Place surveillance), when appellant's counsel began asking about the search of the trash bag the police had seized during their surveillance, the prosecution objected on relevance grounds. The court replied, in front of the jury, "It clearly is irrelevant to the narcotics prosecution. I told him I would let him put on a little scenario of the gambling place." Tr. at 454. Appellant's counsel asked the judge to instruct the jury that the gambling evidence was not irrelevant. The judge gave the following instruction:

> The testimony about gambling and the trash can in the rear of the premises is not relevant to the issue of whether or not Mr. Thornton possessed narcotics for the purpose of distributing them.
>
> It is the defense in this case that he occupied the premises on Simms Place as a gambling premises and that flowed over to 55 P Street. That is his defense in this case. It is not a complete defense. You must, in connection with your service as jurors, evaluate the evidence to see whether the government has proved beyond a reasonable doubt each of the elements of the narcotics charge. You won't have to make any determination with respect

to gambling because it is not in the indictment before you.
*Id.* at 457. Appellant's counsel objected to this instruction, but was directed to proceed with his questioning.

9. The requested instruction was as follows:
> Evidence has been introduced that the person residing in apartment number 2 at 1270 Simms Place, N.E., on and around March 28, 1983, was one Charles J. Thornton. Evidence had also been introduced that Charles Thornton was addicted to heroin and that he sold heroin to support his habit. This evidence was admitted to show that someone other than the defendant Benjamin Thornton committed the offense for which the defendant is on trial.
> Evidence has also been introduced from which you may find that the defendant Benjamin Thornton was present at 1270 and 1265 Simms Place, N.E., in order to use the premises there to run an illegal gambling operation. The defendant is not charged in this case with illegal gambling. This evidence has been admitted for your consideration of whether it shows the reasons why the defendant may have been present at the premises in question. The Government must prove beyond a reasonable doubt that the defendant knowingly and intentionally possessed the controlled substance heroin with the specific intent to distribute it. If you have a reasonable doubt that the defendant was guilty of this offense, then you must find him not guilty.
Appellant's Brief at 33 n. 13.

Thornton's financial resources. The court disagreed, whereupon appellant's counsel elected to have no instruction rather than one with the addendum. *Id.* at 674.

### D

In addition to the foregoing instances, appellant also claims that the trial judge reviewed a presentence report prepared on Mr. Thornton in connection with a 1970 gambling trial before the same judge, and that this review constituted a violation of Fed.R.Crim.P. 32(c).[10] Before *voir dire*, the judge told counsel that "[t]his man [appellant] sold drugs too." Tr. ⅔ (morning) at 3. When asked to explain his comment, the judge stated, "He [appellant] was on trial before me in 1970. I saw the presentence report in that case." *Id.* at 8.

### II

■ In this appeal, Mr. Thornton vigorously contends that the District Court erred in refusing the request for an instruction as to the lesser included offense of simple possession of narcotics. Under settled principles, as Mr. Thornton rightly contends, a defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, "however weak" that evidence may be. "[T]he court may not intrude on the province of the jury which may find credibility in testimony that the judge may consider completely overborne by the 'simply overwhelming' evidence of the prosecutor." *Belton v. United States*, 382 F.2d 150, 155 (D.C.Cir.1967); *see United States v. Comer*, 421 F.2d 1149, 1153–54 (D.C.Cir.1970). Appellant argues that the jury could rationally have found that the only heroin appellant possessed or even knew about was the miniscule quantity (heroin traces) found in the toilet, and that he possessed that amount only briefly for the purpose of keeping it from the police at the door, not with any intent to distribute it. Mr. Thornton claims that if the jury could have found those facts from the evidence presented, it was error for the District Court to refuse to give the requested instruction.

■ Appellant's argument, however, overlooks two relevant principles: *first,* the rule that a refusal to give the lesser included offense instruction is not error when the defense is purely exculpatory, and, if believed, would lead only to acquittal; and, *second,* the principle that a District Judge cannot provide the instruction if the evidence is such that the jury could not rationally find the defendant guilty of the lesser offense. *United States v. Sinclair*, 444 F.2d 888, 890 (D.C.Cir.1971); *Belton*, 382 F.2d at 155–56.

■ As to the first principle, appellant's defense in this case was completely exculpatory. The defense's consistent claim in putting evidence before the jury was that Mr. Thornton did not possess any of the drugs or drug paraphernalia in the apartment. As appellant's counsel stated, the defense was that appellant "was engaged in [gambling] and only that conduct." Tr. at 21. Only at the end of the trial, when all the evidence was in, did appellant's counsel begin to theorize on the possibility of a lesser included offense. Counsel told the District Court that he and his co-counsel were "wrestling around" with the question whether to request the lesser included offense instruction, and that he supposed the jury could find the appellant guilty only of possession. *Id.* at 670. Throughout the presentation of the evidence, however, the defense's case was not in any sense compatible with the proposition that appellant may have been guilty only of possession; to the contrary, the jury was presented only with the theory that Mr. Thornton was completely innocent of the offense charged by virtue of his engaging exclusively in gambling activities.

---

**10.** "The [presentence] report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty or nolo contendere or has been found guilty, except that a judge may, with the written consent of the defendant, inspect a presentence report at any time." FED.R.CRIM.P. 32(c)(1).

It is beyond question that this sort of exculpatory defense does not lend itself to a lesser included offense instruction. "A general denial of guilt, or purely exculpatory evidence, is insufficient to give rise to a genuine conflict over which of two or more offenses might have been committed." Ettinger, *In Search of a Reasoned Approach to the Lesser Included Offense*, 50 Brooklyn L.Rev. 191, 210 (1984); *see Sinclair*, 444 F.2d at 890; *Belton*, 382 F.2d at 155–56.

■ At the same time, we recognize that even where the defendant presents a totally exculpatory defense, the instruction should nonetheless be given if the evidence presented by the *prosecution* provides a rational basis for the jury's finding the defendant guilty of a lesser included offense. *Sinclair*, 444 F.2d at 890. The touchstone is rationality.

After reviewing the entire record in this case, we are firmly persuaded that no rational basis existed in the prosecution's case for a charge of mere possession. If the jury believed the prosecution witnesses, and thus believed that appellant flushed heroin down the bathroom toilet, they could not rationally believe that appellant did not possess the other heroin within the apartment. The evidence showed that on the window ledge outside the bathroom, within easy reach of the toilet the appellant had just flushed, was an immensely valuable cache of heroin. No one could claim, and appellant did not argue, that such an amount of heroin, at such a degree of purity, was consistent with merely personal use. Within the apartment, in plain view, were articles employed to prepare heroin for distribution. Mr. Thornton had keys to the apartment, and was regularly seen entering it during the period of surveillance without relying upon anyone else, including Charles Thornton, for access. Moreover, all of the gambling paraphernalia found was either in the trash or in a suitcase behind a closet door. In a word, the evidence in this case establishes that there were two quantities of heroin in the apartment Benjamin Thornton frequented. One was a large cache with a wholesale value of $44,000; the size of the other was unknown, but apparently smaller than the large one. At trial, the battle raged over whether Benjamin Thornton possessed any quantity at all. A reasonable jury, examining all the evidence, simply would not totally ignore the large cache of heroin and base its verdict solely on the small quantity (indeed, mere traces) seized from the toilet. "[W]hat is fairly inferable from the evidence must be based on reason, calling on the understanding imparted by experience." *Sinclair*, 444 F.2d at 890. The request for a lesser included offense instruction was properly denied.

### III

#### A

In addition to his argument as to the lesser included offense instruction, appellant maintains that the search of 1270 Simms Place was unconstitutional because no probable cause existed. Appellant claims that the surveillance of 1270 Simms Place showed only an association of an unspecific and ambiguous nature with locations that appeared to be part of a gambling operation. Police saw appellant or his daughter visit 1270 Simms Place only seven times, and the trash bag seized by police officers came out of 1265 Simms Place. As to the pen register, appellant argues that the telephone calls from 1270 Simms Place show no recognizable pattern, because only four of the fifteen calls registered to 1270 Simms Place fell within thirty minutes each way of the peak gambling period.

Appellant also argues that even if probable cause existed based on *all* the information then in the possession of the police, the search of the trash bag was unconstitutional, and without the contents of the trash bag, no probable cause existed. Appellant claims that he maintained an expectation of privacy in his trash, and thus the police were required to obtain a search warrant before seizing his trash.

However, we need not reach the questions of probable cause presented by appellant. Under the Supreme Court's recent decision in *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate ... should be admissible in the prosecution's case-in-chief." *Id.* —— U.S. at ——, 104 S.Ct. at 3416. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at ——, 104 S.Ct. at 3423. There is no claim here that the Superior Court judge issuing the warrant abandoned his neutral role. It was eminently reasonable for the Superior Court judge, and the police officers, to believe that the trash bag search was constitutional and its fruits could be used to establish probable cause, given that the overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to trash discarded outside the home and the curtilege thereof.[11] There is no claim that any of the statements by the officers in the affidavits were untrue. Nor could it seriously be claimed that a belief that the fruits of the surveillance provided probable cause was objectively unreasonable. As we have seen, appellant had previous arrests and one conviction for gambling and was observed at 55 P Street and 1265 Simms Place, two locations about which strong evidence existed of gambling activity. He was several times seen entering or leaving 1270 Simms Place during the prime gambling period, and was several times seen walking between 1270 and 1265 Simms Place. The pen register showed that fifteen calls were made to 55 P Street from 1270 Simms Place. With this evidence, it was not unreasonable for the police to believe that there was probable cause that money and records were being kept at 1270 Simms Place. Thus, under *Leon*, the evidence seized from 1270 Simms Place was validly admitted.

**B**

Appellant also argues that the trial court was biased, and that the court's conduct prevented appellant from receiving a fair trial. Our review of the entire proceedings, however, reveals that far from exhibiting bias or prejudice, the District Judge was attempting in a difficult case to steer a reasonable course between the prosecutor's demand to have all evidence as to gambling excluded, and the appellant's desire to go into great detail as to the gambling investigation and the gambling paraphernalia found in the various searches. Time after time, the trial court permitted the presentation of evidence tending to show that Mr. Thornton had been engaged in gambling at 1270 Simms Place. Defense counsel was allowed to call to the stand officers who conducted the gambling investigation, and these officers testified that they believed appellant had been engaged in gambling. Defense counsel was allowed to ask numerous questions designed to show that appellant had been engaged in gambling. But the court reasonably determined, in exercising control of the trial, that it would not permit the defense to go into minute detail on the function of each item of gambling paraphernalia or the conduct of the gambling investigation. It is plainly within the discretion of the trial court to limit the presentation

---

11. *See, e.g., United States v. Terry*, 702 F.2d 299, 308–09 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir.1981); *United States v. Vahalik*, 606 F.2d 99, 101 (5th Cir.1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); *United States v. Crowell*, 586 F.2d 1020, 1025 (4th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978); *Magda v. Benson*, 536 F.2d 111, 112–113 (6th Cir.1976); *United States v. Mustone*, 469 F.2d 970, 972 (1st Cir.1972); *United States v. Jackson*, 448 F.2d 963, 971 (9th Cir.1971), *cert. denied*, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972).

of such cumulative matters consistent, of course, with permitting the defendant a meaningful opportunity to present his case.[12]  *See United States v. Johnson,* 605 F.2d 1025, 1030 (7th Cir.1979) (en banc). Here, as we have seen, the defense was allowed to adduce substantial evidence that appellant was a gambler and had engaged in gambling at 1270 Simms Place; an in-depth examination of the gambling investigation and of each piece of gambling material seized would have been redundant, time-consuming, and possibly confusing to the jury.  Controlling the flow of events at trial in an orderly manner simply cannot be twisted into a showing of bias or prejudice on the part of the District Judge.

■  Likewise, we are satisfied that none of the court's statements to, or in front of, the jury were prejudicial.  It was entirely accurate for the court to point out that the "gambling defense" was not a complete defense; the fact that appellant was at 1270 Simms Place to gamble did not mean he was not there as well to prepare narcotics for distribution, and the jury, if it decided appellant was there for that purpose, did not have to decide if he was also there to gamble.  As for defense counsel's request for a *voir dire* of the jury, counsel provided no evidence or indication that the jury overheard any part of the bench conference.  The trial court need not conduct a *voir dire* on counsel's unsubstantiated suspicion.  *Compare Young v. United States,* 346 F.2d 793, 796 (D.C.Cir.1965) (defense counsel represented to the court that several bystanders had stated that they heard the bench conferences at which the trial judge upbraided counsel).

■  In addition, appellant suffered no prejudice as a result of the denial of his proposed instruction.  The instruction on

the gambling defense that the court included in the charge to the jury was fair and accurate:

> The defendant has introduced evidence of his involvement in the crime of gambling, which is not charged in this indictment.  His purpose in doing so is to provide an explanation of his presence in and occupancy of the premises 1265 and 1270 Simms Place, N.E.

Tr. at 758–59.  This was an accurate representation of appellant's case, and appellant cannot claim prejudice simply because his preferred version was not given.

### C

■  Appellant's final contention is the claim that the trial court reviewed a fourteen-year-old presentence report on appellant before trial, in violation of Fed.R. Crim.P. 32(c).[13]  Appellant claims that since the District Judge evidenced a recollection of the contents of the report, and the report was fourteen years old, it is inconceivable that the judge could have remembered the report from a trial fourteen years ago; instead, the argument goes, the trial judge must have reviewed the report shortly before this trial.  An inference drawn by the appellant, however, is entirely insufficient to fault the District Court.  There must be actual evidence, not mere inferences, that the court below improperly reviewed the presentence report, and the record is devoid of any such evidence.[14]

Finding Mr. Thornton's arguments to be, upon analysis, unmeritorious, we affirm.

*Affirmed.*

---

**12.**  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  FED.R.EVID. 403.

**13.**  For the text of Rule 32(c), see *supra* note 10.

**14.**  Moreover, the authorities on which appellant relies uniformly involve a judge's reading a presentence report *without any proper basis for obtaining access to that report.*  In the case at hand, the District Court would quite properly have had access to and have read Mr. Thornton's presentence report in connection with the earlier sentencing proceeding.