**UNITED STATES of America, Appellee,**

v.

**Bennie Ree WHITE, Appellant.**

**No. 88–2656.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1989.

Decided Nov. 14, 1989.

Rehearing Denied Dec. 12, 1989.

Jerald W. Newton, Santa Monica, Cal., for appellant.

Richard Poehling, St. Louis, Mo., for appellee.

Before ARNOLD and MAGILL Circuit Judges, and PECK,* Senior Circuit Judge.

ARNOLD, Circuit Judge.

Bennie Ree White was indicted for possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II). After entering a conditional plea of guilty and receiving a 63–month prison sentence, White appeals the District Court's[1] denial of his motion to suppress evidence and to quash the search warrants. White also appeals the sentence imposed by the District Court. We agree with White that the officers who detained him in Lambert International Airport lacked an adequate basis to form the reasonable, articulable suspicion of ongoing or imminent criminal activity required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The search that White challenges, however, was authorized by a warrant (obtained by the officers on the basis of information gained during their warrantless detention of White). It was objectively reasonable (even though legally incorrect) for the officers to believe that the information contained in the affidavit for the warrant was lawfully obtained. White was therefore not entitled to have the evidence excluded, *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and we affirm his conviction.

I.

At approximately 5:30 on the morning of March 14, 1988, two officers working with the Drug Enforcement Administration (DEA) Task Force at Lambert International Airport in St. Louis stationed themselves to observe passengers arriving on TWA Flight # 72 from Los Angeles. The officers, Larry Coulson and Larry Fox, had no advance information alerting them to Bennie Ree White or to any other particular passenger. They awaited Flight # 72 because on two occasions in the preceding four months they had seized drugs from passengers traveling on that flight, Tr. 65,[2] and because Los Angeles is considered a source city for drugs.

Officer Coulson testified that White was the last passenger he saw leave the airplane, although he first stated that White "came off near the end of the crowd," and later admitted that he had no "knowledge whether or not there were other passengers on the plane after Mr. White deplaned[.]" Tr. 11, 43. Coulson also acknowledged that the order of passengers exiting an airplane depends to a certain extent on seating assignment and amount of carry-on luggage. Tr. 43.

Besides White's observed position among the deplaning passengers, Coulson also noticed that White was traveling alone, he was holding a small carry-on bag tucked under his arm with both hands instead of using the shoulder strap, and he did not stop to check with a TWA agent or monitor for connecting-flight information, but proceeded directly to the baggage-claim area. As White made his way through the concourse, he stopped and looked around approximately three times—once at the corner of the gate, once just past the screen-

---

* The Hon. John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. The Hon. John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri, acting on the recommendation of the Hon. Carol Jackson, United States Magistrate for the Eastern District of Missouri.

2. Citations to the transcript refer to the July 8, 1988 hearing.

ing area, and once at the corner before the carousel area—according to Coulson, who concluded that White was nervous. Tr. 14–15, 43. At the baggage carousel, White continued to appear agitated to Coulson, who testified that White tapped his foot, wrung his hands, and seemed "anxious for his bag to come on." Tr. 15. White retrieved a suit bag, and then walked with both pieces of luggage to a nearby row of chairs, where he began fastening a shoulder strap onto the larger bag.

At that point, Officers Coulson and Fox approached White. White was still facing the chairs, adjusting the strap, when Coulson circled around behind him to determine if there were any bulges in White's pockets. Coulson detected nothing conspicuous such as a bulge. Tr. 54. Fox and Coulson then identified themselves as drug agents and asked if White would talk to them. Fox was standing in front of White, and Coulson was standing right next to Fox, two to three feet from White. Tr. 53, 71. White testified that, with the row of chairs behind him, he felt that he would have to walk through the officers to leave and that he could not do that. Tr. 71.

He agreed to speak with the officers, and answered truthfully when asked if he had just arrived on a flight from Los Angeles. He produced his airline ticket and identification upon request, and the name on his ticket matched that on his driver's license. The ticket was for a one-way trip from Los Angeles to St. Louis, and had been purchased with cash. The precise cost of the ticket is not clear from the record, but it was less than $500. Tr. 48. According to Coulson, White's hands were trembling when he removed his driver's license from his wallet.

After the license and ticket were handed back to him, White asked why he had been stopped. Fox responded that White exhibited characteristics of individuals trafficking in narcotics. Fox then requested permission to search White's luggage, and White declined to give his consent. The officers "again explained to him what the situation was" and that the search would be brief. Tr. 20. Nevertheless, White said he wanted to take his luggage and leave. At that point, the officers told White that he was not under arrest and was free to go, but he could not leave with his luggage. The bags would have to stay in order to allow a narcotics detection dog to sniff them. White testified that he asked six or seven times to leave with his luggage and each time was told he could not. Tr. 71–72.

Officer Coulson left to get the trained dog and, upon his return with the dog a minute later, found that Fox had taken White to the DEA office in the airport, where the officer was preparing a receipt for White's bags. At the office, Coulson started the dog on its search while White was still present, and the dog "alerted" to one of the pieces—the carry-on bag. After the dog completed its search, White was given a receipt for both bags, and he left the airport without his luggage. Later that morning, the officers obtained a warrant to search the carry-on bag. They found a package containing cocaine in it, and used that discovery to support an application for a warrant to search the larger bag for evidence of narcotics traffic. Apparently, no such evidence was found in the second bag.

White moved to suppress the evidence obtained pursuant to the search warrant, asserting that the officers detained him and his luggage without a reasonable suspicion of criminality. The Magistrate remarked that "it is evident that the initial [consensual] encounter ultimately escalated into an investigative seizure.... [which] must be supported by a reasonable and articulable suspicion of criminal activity" to withstand scrutiny under the Fourth Amendment. No. 88–0104–CR(1), Memorandum at 7 (July 13, 1988). The Magistrate concluded that the officers' observations provided them with the basis for such suspicion, *id.* at 7–8, and recommended denial of the motion to suppress. The District Court adopted the Magistrate's Memorandum and Recommendations, with a supplemental discussion in which the Court held that the encounter between White and the officers had been entirely consensual, and that White had been free to leave at all times, although not with his luggage.

White entered a conditional guilty plea, reserving his right to challenge the denial of his motion to suppress. The District Court sentenced him to 63 months' imprisonment with a four-year term of supervised release, a $2,500 fine, and a $50 fee. White brought this appeal, raising again his Fourth Amendment claim regarding the search, as well as challenging the constitutionality of the Sentencing Guidelines and of the mandatory five-year minimum prison term for the charged offense, and arguing for a two-step reduction in his base offense level for acceptance of responsibility, under Guidelines § 3E1.1.

## II.

■ We agree with the Magistrate that what began as a consensual encounter between the officers and White escalated into a *Terry*-type investigative stop requiring a reasonable, articulable suspicion to survive Fourth Amendment scrutiny. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When White asked why he had been stopped, and Officer Fox responded that White exhibited characteristics of those trafficking in drugs, White could reasonably believe at that point that he "was the particular focus of a narcotics investigation," and was not free to go. *United States v. Nunley*, 873 F.2d 182, 184–85 (8th Cir.1989) (consensual encounter transformed into seizure when agent "told Nunley that he was there to stop the flow of drugs through the airport, in response to her query about why he was questioning her"). See also *United States v. Sadosky*, 732 F.2d 1388, 1392–93 (8th Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984):

> A *Terry* analysis is ... necessary because, as the conversation between Sadosky and the law enforcement agents proceeded, Agent Olby stated that they were investigating possible narcotics violations and that they wanted to question Sadosky due to his unusual behavior. These ... statements ... indicated to Sadosky that the agents' investigation was in fact focused on him and implied that Sadosky's failure to cooperate could lead to his arrest. Thus there was a reasonable indication that Sadosky was restrained or seized, despite the agents' assurance that he was free to go.

The fact that more than one officer approached White,[3] and that the two officers stood in front of him while his back was to the row of chairs, in a way which seemed to block his means of egress, further contributed to his reasonable perception that he was not free to leave immediately.

Officer Coulson testified that they told White he could go, so long as his luggage remained for the dog to sniff. Tr. 21. Even by Coulson's account, though, that statement was made after Coulson announced that White fit the drug-courier characteristics and both officers tried to persuade White to consent to a search of his bags. By that time, the encounter had already become a stop, subject to the Fourth Amendment's requirements.

■ In any case, even if White was at all times free to leave, officers must have a reasonable, articulable suspicion to justify detention of a person's luggage, just as they must have to detain the person himself. The Supreme Court rejected the premise that "seizures of property are generally less intrusive than seizures of the person," in a case where "[t]he precise type of detention ... is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog.... [T]he police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." *United States v. Place*, 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983) (seizure of luggage in an airport must satisfy the standards of *Terry* and its progeny, and 90–minute detention of Place's luggage exceeded limits of permissible restraint). The officers confronting White, therefore, needed sufficient grounds to form a reasonable, articulable suspicion of criminal activity in order to detain White's bags.

---

**3.** See *United States v. Saperstein*, 723 F.2d 1221, 1226 (6th Cir.1983).

### III.

We hold that Officers Coulson and Fox lacked an adequate basis to justify their seizure of the luggage. According to the Magistrate, "the officers relied in part on White's conformity to several characteristics of the drug courier profile ... [and on] other factors related to White's behavior which led the officers reasonably to suspect that White was transporting drugs." No. 88–0104–CR(1), Memorandum, *supra*, at 7. The drug courier profile characteristics identified by the Magistrate were that White was traveling from a source city, that he arrived early in the morning, that the flight he was on had previously yielded arrests of narcotics traffickers, and that he had purchased a one-way ticket with cash. The other behavioral factors cited by the Magistrate were that White held his carry-on bag closely with both hands rather than using the shoulder strap, and that he appeared nervous as he walked through the airport ("repeatedly stopping and looking around") and as he talked with the officers ("[h]is hands were trembling such that he had trouble removing his driver's license from his wallet"). *Id.*

While we think the set of factors cited by the Magistrate makes this a very close case, we are guided by the Supreme Court's *per curiam* ruling in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In *Reid*, all but one of a set of circumstances were held to "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* at 441, 100 S.Ct. at 2654. Thus, the Court discounted the following factors: that Reid flew in from a principal source city, that he arrived early in the morning, "when law enforcement activity is diminished," and that he had no luggage other than a shoulder bag. *Id.* Implicitly, the

Court also found irrelevant that the itinerary on the tickets of Reid and his companion showed a visit of only one day in Ft. Lauderdale, and that both men appeared nervous during the encounter with the DEA agent. *Id.* at 439, 100 S.Ct. at 2753. The Court dismissed the one circumstance that distinguished Reid from the "very large category of presumably innocent travelers"—that Reid appeared to be concealing the fact that he was traveling with someone. The Court characterized this factor as an " 'inchoate and unparticularized suspicion or "hunch," ' [quoting *Terry*, *supra*,] 392 U.S., at 27 [, 88 S.Ct. at 1883] ... [and] simply too slender a reed to support the seizure in this case." *Reid, supra*, 448 U.S. at 441, 100 S.Ct. at 2754. The agent had observed Reid walking through the concourse and looking backward several times through the crowd in the direction of the other man, who carried a shoulder bag like Reid's. The two men met briefly in the main terminal, and then left the airport together. Outside the building, the agent asked to see their tickets and identification, and requested that they return to the terminal for a search of their persons and bags. Reid nodded in assent, but then attempted to flee and abandon his bag, which was later found to contain cocaine.[4] The Supreme Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Reid, supra*, 448 U.S. at 441, 100 S.Ct. at 2754.

The circumstances observed by Officers Coulson and Fox warrant the same conclusion as that reached in *Reid*. Like Reid, White arrived from a source city in the early morning. The fact that Coulson's surveillance of Flight #72 over a four-month period resulted in two prior narcotics-related arrests is not particularly telling, given that this Monday morning flight from Los Angeles to St. Louis made rough-

---

**4.** Reid's resistance—his attempted flight and abandonment of the evidence—could not provide the basis for the reasonable, articulable suspicion which the agent had to have in order to justify the stop in the first place. Likewise, Officers Coulson and Fox cannot use White's refusal to consent to the search of his bags as support for the requisite reasonable, articulable suspicion. See *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality); *Nunley, supra*, 873 F.2d at 185 n. 4.

ly sixteen trips over those months, carrying an average of 300 to 400 passengers per trip, Tr. 41–42, for a total of approximately 4,800 to 6,400 passengers.[5] That White held his carry-on bag with both hands, "[t]ight, tucked up under his arm where the shoulder strap would normally be hung down to the handle ... so that he wouldn't lose custody of it," Tr. 45, is unremarkable. It would be strange were DEA agents to stop random passengers for opting not to use their shoulder straps and appearing determined not to lose their luggage.

As for the appearance of nervousness, this factor was given no weight in *Reid,* and there are certainly plausible explanations besides narcotics traffic to account for White's behavior. Coulson agreed on cross-examination that it is "not unusual at all to find people that appear to be nervous in airports," due to the safety risks associated with flying, scheduling delays that interfere with appointments, and other causes. Tr. 39. Moreover, Coulson agreed that passengers traveling on early morning flights may appear more disoriented, Tr. 46, and that it is not unusual for individuals to look around in an airport to get their bearings upon arrival, particularly if they have never flown into the airport before. Tr. 45–46. White, according to Coulson, stopped and looked around at three points during his passage from the gate to the baggage area, again behaving in a way similar to Reid, who looked backward occasionally in the direction of the other man. White took no detours and made no evasive movements. Compare *United States v. Erwin,* 803 F.2d 1505, 1506, 1510 (9th Cir. 1986) (circuitous route taken through terminal without adequate explanation helped establish requisite degree of suspicion). He tapped his foot and wrung his hands while waiting at the baggage chute, behavior which indicated to Coulson that White was anxious for his luggage to show up, but which any traveler concerned about the possibility of lost or damaged items might exhibit. Finally, he seemed nervous while answering the questions put to him by the two officers, and his hand trembled when he got out his driver's license. However, becoming nervous when one is confronted by officers of the law is not an uncommon reaction, as Coulson testified, Tr. 40, and again, the Supreme Court did not find it significant that Reid appeared anxious during his encounter with the DEA agent.

Of those factors to which the Magistrate in White's case did not give explicit credence, but which Coulson noted as significant at the hearing, we find none persuasive. We include here one's position as the last, or nearly last, passenger observed to disembark, one's status as a person traveling alone, one's possession of a carry-on bag, and one's failure to stop and consult with an airline representative or computer monitor regarding connecting flights. Tr. 11–14. As discussed earlier, a passenger's position stepping off a plane depends in part on seating assignment and retrieval of bags, and Officer Coulson was not even sure that White was the last one to deplane. Many passengers travel alone and have carry-on bags, and once they reach their destinations, as White had done, they have no reason to check connecting-flight information. The characteristics to which officers, and some courts, attach significance in defense of narcotics-related airport stops are disconcertingly interchangeable. See *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1588–89, 104 L.Ed.2d 1 (1989) (dissent) (citing cases that identify the following as suspicious characteristics: first to deplane; last to deplane; deplaning in middle of crowd; one-way ticket; round-trip ticket; non-stop flight; changing planes; no luggage; gym bag; new suitcases; traveling alone; traveling with companion; acting nervously; acting too calmly).

Of all the circumstances mentioned by the Magistrate and Officer Coulson, only one remains that might set this case apart from *Reid* in any meaningful way—the

---

5. Coulson testified to the significance of this Monday morning flight: "Predominant number of seizures of large quantities of cocaine have been off that particular flight." Tr. 9. He also testified that he made four seizures of drugs from that flight over the four-month span, Tr. 41, but admitted that his encounter with White was the third of the four seizures, Tr. 65, meaning that only two preceded the one involving White.

fact that White purchased his one-way ticket with cash. However, we believe that the suspiciousness of White's ticket is no greater than that of Reid's ticket showing an itinerary with a one-day turn-around in Ft. Lauderdale.[6] A ticket purchased with cash may mean nothing more than that the holder did not have the use of a credit card, and when the ticket shows a moderate coach fare and a name matching the passenger's other identification, it provides less reason to suspect criminal activity. See *Saperstein, supra,* 723 F.2d at 1228–29. Coulson testified that he believed White was answering the officers' questions truthfully,[7] that White was not using an alias as drug couriers often do, and that "many times narcotics is carried on a person, and bulges are conspicuous," but he detected no such bulges in White's pockets. Tr. 51, 54–55. Moreover, White had checked luggage in addition to his carry-on bag, making him less unusual in that regard than Reid, who traveled with only a shoulder bag.

Considering as a whole the circumstances given weight by the Magistrate in her Memorandum and by Coulson in his testimony, we hold that the officers lacked a reasonable, articulable suspicion to justify the detention of White or his luggage. Without having any advance information that suggested "criminal activity may be afoot," *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884, or that pointed to someone matching White's description, the officers relied on the sort of "fragmentary facts" that the Supreme Court rejected as a valid basis for the investigative stop in *Reid. Reid, supra,* 448 U.S. at 442 n. 1, 100 S.Ct. at 2755 n. 1 (Powell, J., concurring).

The government argues, however, that this conclusion does not necessarily end this case. We agree. The officers did not open and search the luggage until they had prudently obtained warrants. This step, which the law encourages, brings into play the rule of *United States v. Leon,* *supra,* which the government cites: evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid. This case fits the rule. We believe the Fourth Amendment was violated, but we also believe the facts of this case are close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable. The purchase of the ticket for cash, plus the incremental effect of the other factors present in this case, pushes this case into the gray area created by *Leon.* Accordingly, it was not error to allow the fruits of the search to come into evidence, and the conviction must be affirmed.

## IV.

White also challenges on several grounds the sentence he received. They are without merit. *United States v. Mistretta,* — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In addition, we believe the District Court committed no error in refusing to give White credit for acceptance of responsibility, and that the sentence did not violate the Eighth Amendment.

MAGILL, Circuit Judge, concurring.

I join the judgment and parts I, II, and IV of the majority's opinion. I write separately because I believe the officers who detained White in the St. Louis Lambert International Airport had a reasonable, articulable suspicion that White was engaged in ongoing or imminent criminal activity. The majority errs: 1) in failing to accord sufficient deference to the experience of the two Drug Enforcement Agents who detained White; 2) in primarily focusing on each drug profile characteristic and behavioral factor individually, with little atten-

---

6. Cf. *Sadosky, supra,* 732 F.2d at 1393, 1394 (fact that round trip between Minneapolis/St. Paul and Miami or the Cayman Islands took a little over 24 hours contributed to agents' reasonable suspicion); *United States v. Manchester,* 711 F.2d 458, 461 (1st Cir.1983) ("implausibility of a one-day vacation in Ft. Lauderdale was sufficient to arouse the suspicions of the agents").

7. Compare *United States v. Pantazis,* 816 F.2d 361, 363 (8th Cir.1987) (officer's suspicions "solidified" when Pantazis "pointedly lied to avoid any connection between his trip and a narcotic-source city").

tion to how, when viewed together, they created a reasonable suspicion that White was engaged in the trafficking of narcotics; and 3) in concluding that the warrant lacked probable cause.[1]

## I.

The Supreme Court has emphasized that courts should treat the judgment of experienced officers with a considerable amount of deference. Because of their expertise, these officers are "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979); *see also United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (experienced officer able to draw "inferences and make[ ] deductions—inferences and deductions that might well elude an untrained person"); *accord United States v. Colyer*, 878 F.2d 469, 480 (D.C.Cir.1989) (dictum) (reliance by experienced agent on methods and patterns of certain lawbreakers must be taken into account in determining whether officers had reasonable suspicion to detain). Justice Powell, concurring in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), underscored the nature of the deference to which experienced officers are entitled. "Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." *Id.* at 563, 100 S.Ct. at 1882. Therefore, viewing the facts from the standpoint of an experienced officer, reasonable suspicion might exist where it would not exist if the same facts were viewed from the standpoint of an untrained observer.

Officer Larry Fox (Officer Fox) and Officer Larry Coulson (Officer Coulson) are police officers with the St. Louis County Police Department. At the time of White's detention, both were assigned to the drug interdiction programs at Lambert Airport as Special Agents of the Drug Enforcement Administration. Officer Fox had served on the police force for sixteen years. Officer Coulson had been assigned to the airport interdiction effort for eight years. Both officers had been personally involved in the seizure of narcotics on previous occasions from the same Monday morning flight on which White was a passenger.[2] By itself, neither Officer Fox's nor Officer Coulson's expertise is sufficient to establish reasonable suspicion from facts which could not possibly create such a suspicion. However, their expertise is a factor which in a close case, such as this,[3] should lead the court to hold that they had a reasonable and articulable suspicion of ongoing criminal conduct.

## II.

The majority also errs in dismissing the drug profile characteristics and other behavior factors individually with little attention to their cumulative effect. In so doing, the majority gives insufficient weight to the possibility that taken together these factors, although individually consistent with innocent behavior, might amount to reasonable suspicion. Instead, the majority in only one sentence summarily states that it has considered the circumstances as a whole in holding the officers lacked a "reasonable, articulable suspicion to justify the detention of White or his luggage." Even before the majority announced its holding, however, it had already rejected many of the factors, finding them to be consistent with innocent behavior. For example, the majority dismisses nervousness as a factor in part because there are "certain plausible explanations besides narcot-

---

**1.** Because I find that the *Terry* stop was valid, I need not reach the issue decided by the majority today that the *Leon* good faith exception can cure the taint of illegally obtained evidence when that evidence is used to obtain a warrant. Nevertheless, I do find the majority's extension of the *Leon* doctrine to be persuasive. *See United States v. Thorton*, 746 F.2d 39, 48–49 (D.C. Cir.1984); *United States v. Thomas*, 757 F.2d

1359, 1366–68 (2d Cir.1985). *But see United States v. Vasey*, 834 F.2d 782, 788–90 (9th Cir. 1987).

**2.** White has not challenged the experience and skill of either officer.

**3.** Even the majority agrees that this is a "close case."

ics traffic to account for White's behavior." [4] Furthermore, the majority dismisses as consistent with innocent activity and therefore "[un]persuasive" factors such as one's position as the last or almost the last passenger to deplane, one's status as a person traveling alone, one's possession of a carry-on bag, and one's failure to consult with a computer monitor or an airline representative regarding connecting flights.

Even if every factor relied upon by these experienced officers was consistent with innocent activity, it is inappropriate to dismiss them as being unable to raise a reasonable and articulable suspicion of criminal activity. The Supreme Court in *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989),[5] held that even if every factor an officer relies upon is consistent with innocent activity, "taken together they may amount to reasonable suspicion." *Id.* 109 S.Ct. at 1586. For example, in *Sokolow*, each factor relied upon could have been (and in one case was) innocent. By the time the officers detained the defendant in *Sokolow*, they knew that (1) he paid cash ($2,100) for two airline tickets from a roll of twenty dollar bills; (2) he traveled under a name which did not correspond with the name under which his telephone was listed;[6] (3) his original destination was a source for drugs; (4) he stayed in that city for only twenty hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. Each of these factors is consistent with innocent behavior. The Court did not dismiss each factor, however, because con-

sidered as a whole they established reasonable suspicion of criminal activity. *Id.* at 1583, 1586–87.

The same issue confronts this court. Each factor by itself may be consistent with innocent activity but taken as a whole, although it is a close case, the factors established reasonable suspicion for the experienced officers to detain White. In this case, the officers at the time of the detention were aware of the following factors: (1) White traveled from a source city (Los Angeles) to a use city (St. Louis);[7] (2) he purchased a one-way ticket; (3) he paid cash for his ticket (under $500); (4) he was either the last to deplane or was near the end of the crowd; (5) he was traveling alone; (6) he was holding a small carry-on bag tightly under his arm with both hands;[8] (7) he arrived on an early morning flight when security is usually diminished; (8) he arrived on a Monday morning flight on which other drug arrests had been made; (9) he did not stop to talk with TWA agents or check any monitors for a connecting flight to somewhere other than a use city but instead went straight to the baggage area;[9] (10) he appeared nervous in the airport "repeatedly stopping and looking around" on his way to the baggage claim area; (11) he appeared agitated and anxious for his baggage to come, nervously tapping his foot and wringing his hands; (12) when approached by both officers he appeared nervous and when asked for his driver's license, he trembled so much that

---

**4.** The majority quotes Officer Coulson's testimony that individuals might be nervous in airports because of the safety risks associated with flying, because of scheduling delays and other reasons. However, it is unlikely a passenger would be concerned about an airline crash when he has already landed at his destination. Furthermore, there is no evidence in the record that there were any scheduling delays.

**5.** The only mention of *Sokolow* by the majority is Justice Marshall's dissent attacking reliance on drug profile characteristics as a general rule. This position was clearly rejected by the majority of justices on the Supreme Court. *Sokolow*, 109 S.Ct. at 1586–87.

**6.** *Sokolow* did not attempt to conceal his name when purchasing his ticket. His name did not

correspond with the telephone number he provided because the number was listed under his roommate's name.

**7.** Factors 1–5 and 7 are characteristics of flight travel that drug enforcement officials look for when conducting surveillance. Tr. 12, 18 (July 8, 1988). All subsequent references to the transcript are from July 8, 1988.

**8.** The previous seizures that Officers Fox and Coulson have made on the Monday morning flight on which White traveled involved large quantities of cocaine carried in carry-on bags. Tr. 12–13.

**9.** White avoided the TWA personnel by "cutting through the seating area and heading down the concourse toward the departure area." Tr. 14.

he could barely retrieve his license from his wallet.

The factors relied on by the officers in *White* are no less incriminating than the factors in *Sokolow*.[10] Taken individually, each factor may well be consistent with innocent activity; however, taken as a whole and viewed from the standpoint of experienced officers who had on two prior occasions arrested individuals for drug trafficking on that flight, it cannot be said that the officers' conclusion that a reasonable suspicion of criminal activity existed to detain White and his luggage was in error.

The majority primarily relies on the Supreme Court's 1980 decision in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). In that case, however, the Court only considered the four factors upon which the appellate court relied. *Id.* at 440–41, 100 S.Ct. at 2754. There are six additional factors present in this case. First, White appeared nervous in the airport terminal even before approached by the officers. Reid did not. Second, after the officers approached White his hands trembled so violently he could barely take his driver's license out of his wallet. There is no such physical evidence of nervousness mentioned in *Reid*. Third, the flight on which White arrived had been the source of drug trafficking in the immediate past. There is no such evidence mentioned in *Reid*. Fourth, when deplaning, White held on to his shoulder bag tightly in a manner different from all the other passengers with shoulder bags. Tr. 66. Reid did not. Fifth, White traveled alone, unlike the petitioner in *Reid* who traveled with a companion. Sixth, White was either the last to deplane or was near the end of the crowd. There is no such evidence mentioned in *Reid*.[11]

Although this is a close case, viewing the facts through the eyes of Officers Coulson and Fox who have had over twenty-four years of experience between them and who are familiar with the early morning Monday flight, drug interdiction efforts and the Lambert Airport, I believe that a reasonable and articulable suspicion of criminal activity existed to detain White and his luggage.

III.

Although the detention of White and his luggage was legal, I must still determine whether the search of his carry-on bag was valid. I would hold that the warrant itself was valid and not reach the good faith issue. In his affidavit, Officer Fox informed the Magistrate of all the activities both officers observed on the morning of March 14, 1988 before detaining White. In addition to these observations, they informed the Magistrate of the positive reaction of their German Shepherd dog, which had been assigned to the Lambert Airport drug interdiction program for two years, when exposed to White's carry-on bag. The positive canine sniff when combined with the officers' observations prior to White's detention, was sufficient to turn the reasonable suspicion into probable cause. Therefore, the warrant and subsequent search pursuant thereto was valid. *See United States v. Quinn*, 815 F.2d 153, 160, 161 (1st Cir.1987) (canine sniff turned reasonable suspicion into probable cause); *United States v. Colyer*, 878 F.2d 469, 471, 483 (D.C.Cir.1989) (dictum) (probable cause existed to search and seize bags when positive dog sniff combined with computer information that defendant departed from source city and traveled to use city, made reservation day before departing, pur-

**10.** Although two factors in *Sokolow* are not present in this case and there is no evidence here concerning a third present in *Sokolow*, at least eight factors in the case at bar were not present in *Sokolow*. While it is not sufficient to merely count the number of factors present to determine if a reasonable suspicion to detain exists, the large number of factors present here combined with the fact that they are included as relevant characteristics drug enforcement officials look for when conducting surveillance, is

enough to establish reasonable suspicion when the observer is an experienced officer.

**11.** The fact that the petitioner in *Reid* had no additional luggage while White had one piece of checked luggage does not alter the conclusion that the officers in *White* had a reasonable and articulable suspicion of ongoing criminal activity given the larger pool of information available to the officers in *White* when compared to *Reid*.

chased his ticket within a few minutes of departure, purchased a one-way ticket with cash, and left a call back number in the source city).

I would affirm.