UNITED STATES of America, Appellee,

v.

**Michael Joseph SADOSKY, a/k/a William M. Ryan, Appellant.**

No. 83–1876.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1983.

Decided May 15, 1984.

Rehearing and Rehearing En Banc Denied May 15 and June 26, 1984.

Resnick & Bartsh, P.A., Phillip S. Resnick, Minneapolis, Minn., for Michael Sadosky.

James M. Rosenbaum, U.S. Atty., John M. Lee, Asst. U.S. Atty., D. Minn., Minne-

apolis, Minn., Lynn Taplin, Legal Intern, for appellee.

Before ROSS, ARNOLD and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Michael Joseph Sadosky appeals from his conviction of knowingly and intentionally possessing with the intent to distribute approximately 345 grams of cocaine in violation of 21 U.S.C. § 841. We affirm.

Minnesota Bureau of Criminal Apprehension Special Agent Thomas Olby first observed Sadosky on March 1, 1983 at the Minneapolis-St. Paul Airport. Sadosky had just arrived on a flight from Miami and Atlanta. Agent Olby testified that Sadosky was wearing sunglasses and that he appeared nervous, occasionally looking over his shoulder and from side to side as he proceeded to the baggage claim area. Agent Olby testified that he further observed Sadosky's nervous behavior at the baggage claim area where Sadosky paced and looked around repeatedly. When his luggage did not appear at the baggage claim area, Sadosky went to the airline desk and filed a lost baggage report. Agent Olby learned from airline personnel that this report was filed under the name of William Ryan. The report also included an address and a telephone number. Further investigation of the information Sadosky provided in the lost baggage report showed that the telephone number did not correspond to the address and that neither the telephone number nor the address corresponded to the name William Ryan.

At about 2:30 p.m. on March 17, 1983, Agent Olby, accompanied by Officer Marilyn Mortensen, again observed Sadosky at the Minneapolis-St. Paul Airport. This time Agent Olby recognized Sadosky among the passengers on a flight arriving from the Cayman Islands, Miami, and Atlanta. Agent Olby testified that Sadosky looked to his far left where Officer Mortensen and he were stationed and that Sadosky stared at them. Officer Mortensen told Agent Olby that she also recognized Sadosky because she had seen him at the airport on the preceding day, March 16, 1983, at about 1:30 p.m., walking towards gate 71. There was testimony that a daily flight departed gate 71 for Miami and the Cayman Islands at about 1:50 p.m. Agent Olby and Officer Mortensen followed Sadosky away from the gate area. Agent Olby testified that when Sadosky passed a security checkpoint for passengers boarding departing flights, he stopped, stepped backwards and stared at the X-ray machine. Sadosky then proceeded through the airport terminal. Agent Olby testified that while Sadosky made his way from the gate at which he arrived to an exit in the airport terminal, he repeatedly looked over his shoulder at the two officers. Sadosky was again wearing sunglasses. He was carrying a small bag and did not go to claim any other baggage. Agent Olby and Officer Mortensen followed Sadosky through the exit and approached him just outside the door.

According to Agent Olby, they told Sadosky that they were law enforcement officers and that they wanted to ask him some questions. Sadosky agreed to answer their questions and told them that he had just arrived on an incoming flight. When asked by Officer Mortensen to see his ticket, Sadosky said he did not have one and wanted to know why he was being hassled. Officer Mortensen told Sadosky that he was not under arrest and that he was free to go. Officer Mortensen then asked Sadosky for identification. Sadosky refused to comply unless he was under arrest. Agent Olby again told Sadosky he was free to go but that they were investigating possible narcotics violations and that because of his unusual behavior they wanted to ask him some questions. Sadosky then denied having departed from the Minneapolis-St. Paul Airport the preceding day and refused to allow Agent Olby to search his bag unless he was under arrest. Agent Olby informed Sadosky that while he was still free to go, they were going to seize his bag so that a narcotics detection dog could be brought to sniff the bag. While Agent Olby was filling out a receipt for the bag, Sadosky

asked to telephone a lawyer. Agent Olby told Sadosky he was free to do so and Sadosky, who still had the bag, went back inside the airport terminal. Agent Olby and Officer Mortensen followed Sadosky and stood a distance away from him while he talked on the telephone. The conversation between Sadosky and the officers outside the terminal had lasted three to four minutes.

While Sadosky was on the telephone, Drug Enforcement Administration (DEA) Special Agent James Lewis approached Agent Olby. According to his testimony, Agent Lewis had watched Sadosky walk through the airport and had observed Sadosky being stopped by Agent Olby and Officer Mortensen. Agent Lewis testified that while Sadosky was on the telephone, Agent Olby briefly told him of the events that had transpired. Agent Lewis, whose presence was unknown to Sadosky, moved to a point approximately seventy feet from Sadosky for the purpose of observing him. After watching Sadosky for four to five minutes, he saw a quick, white, shiny flash as Sadosky transferred something from his bag to his jacket pocket. Agent Lewis immediately informed Agent Olby and Officer Mortensen of what he had seen. Agent Lewis then arrested Sadosky. Cocaine was seized at the time of this arrest pursuant to a search of Sadosky's person.

Sadosky testified that the officers did tell him once that he was free to go but that he stayed because he felt intimidated and thought he was under arrest. Sadosky also testified that the officers did not physically touch him or the bag until they arrested him inside the terminal. According to Sadosky, while he was talking on the telephone inside the airport terminal, he purposefully stood in a position that he thought would enable him to transfer the cocaine from his bag to his jacket without being seen by Agent Olby and Officer Mortensen. He admitted, however, that he did not know that Agent Lewis was watching him from a different location.

Sadosky moved to suppress the evidence seized from him at the airport. A suppression hearing was held after which the district court denied the motion to suppress. Sadosky waived his right to a jury trial. The district court, based on certain stipulated facts and on evidence from the suppression hearing, entered its judgment convicting Sadosky on May 10, 1983.

■ In his motion to suppress, Sadosky argued that the evidence obtained at the Minneapolis-St. Paul Airport should have been excluded because it (1) was obtained as a result of an unlawful stop and (2) was obtained pursuant to a warrantless arrest made without probable cause. The district court considered these claims and denied the motion. Sadosky now raises the same issues on appeal. In the context of a motion to suppress, this Court will affirm the district court's determinations unless they are clearly erroneous. *See, e.g., United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982). We have reviewed the entire record and conclude that there was substantial evidence to support the district court's denial of the motion to suppress.

■ It is well established that, under the Fourth Amendment, seizures of persons generally must be supported by probable cause. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). But, under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), investigative seizures may withstand Fourth Amendment scrutiny when they are based upon a reasonable, articulable suspicion that a person has committed or is about to commit a crime. *Accord Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Thus, the Supreme Court has recognized "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981).

Recently the Court twice has interpreted *Terry* in the context of airport search and seizure cases. In *Florida v. Royer*, 460

U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) [hereinafter *Royer*], even though circumstances justified the initial stop of Royer, the Court affirmed the Florida District Court of Appeal's reversal of Royer's conviction because the limits of a *Terry* stop had been exceeded. Royer's airline ticket and driver's license were retained by detectives and his checked baggage was retrieved from the airline without his consent. Furthermore, Royer, a departing airline passenger, was taken from the public point of the initial stop and held in what amounted to a police interrogation room for fifteen minutes before contraband was discovered. The Court concluded that as a practical matter Royer had been placed under arrest. *Id.* at ——, 103 S.Ct. at 1327, 75 L.Ed.2d at 240. In *United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) [hereinafter *Place*], two DEA agents stopped Place, an arriving airline passenger, at LaGuardia Airport. After brief questioning, Place was allowed to leave but, because he refused to consent to a search of his luggage, the agents kept his two bags. The agents took the bags to Kennedy Airport and exposed them to a trained narcotics dog. The dog reacted positively to one bag and ambiguously to the second. Ninety minutes had elapsed since the luggage initially had been seized. The Court affirmed the decision of the Second Circuit which reversed Place's conviction because "[t]he length of the detention of [Place's] luggage alone preclude[d] the conclusion that the seizure was reasonable in the absence of probable cause." *Id.,* at ——, 103 S.Ct. at 2645, 77 L.Ed.2d at 122.

Even though the Court held that neither Royer nor Place could be convicted on the particular facts of their cases, the propriety of *Terry* stops in the context of airport narcotics violation cases remains solidly intact. A "reasonable suspicion of criminal activity ... warrant[s] temporary detention for questioning on less than probable cause where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime." *Royer,* 460 U.S. at ——, 103 S.Ct. at 1324, 75 L.Ed.2d at 237; *accord Place,*

—— U.S. at —— ——, 103 S.Ct. at 2642–43, 77 L.Ed.2d at 118–19. Furthermore, "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion." *Place,* at ——, 103 S.Ct. at 2644, 77 L.Ed.2d at 120. Both cases, however, emphasized that such stops must be limited to what is necessary to effectuate the purpose of the stop. *Id.* at —— ——, 103 S.Ct. at 2643–44, 77 L.Ed.2d at 119–20; *Royer,* 460 U.S. at ——, 103 S.Ct. at 1325, 75 L.Ed.2d at 238.

It is unnecessary to analyze the initial approach of Sadosky under the principles of *Terry* because, merely by approaching Sadosky, by identifying themselves as law enforcement agents, and by asking Sadosky if he would be willing to answer their questions, Agent Olby and Officer Mortensen did not make a seizure of Sadosky's person. *Royer,* 460 U.S. at ——, 103 S.Ct. at 1323, 75 L.Ed.2d at 236; *see INS v. Delgado,* —— U.S. ——, 104 S.Ct. 1758, 1761–63, 80 L.Ed.2d 247 (1984). The initial approach of Sadosky amounted only to a consensual conversation, not to a seizure. But "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention ..., 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Delgado,* 104 S.Ct. at 1762 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). A *Terry* analysis is therefore necessary because, as the conversation between Sadosky and the law enforcement agents proceeded, Agent Olby stated that they were investigating possible narcotics violations and that they wanted to question Sadosky due to his unusual behavior. These later statements by Agent Olby indicated to Sadosky that the agents' investigation was in fact focused on him and implied that Sadosky's failure to cooperate could lead to his arrest. Thus there was a rea-

sonable indication that Sadosky was restrained or seized, despite the agents' assurance that he was free to go.

We hold that, at the point in the conversation when Agent Olby made these later statements, Sadosky was the subject of a lawful *Terry* stop. In reaching this result, we have considered that, when the stop occurred, the law enforcement agents knew the following:

(1) When first observed at the Minneapolis-St. Paul Airport on March 1, 1983, Sadosky was wearing sunglasses and, according to Agent Olby, behaved nervously;

(2) In a lost baggage report filed on March 1, 1983, Sadosky gave the airline the name William Ryan. Sadosky also listed an address and a telephone number in this report. Neither the address nor the phone number corresponded to one another nor to the name William Ryan;

(3) Sadosky was seen at the airport at approximately 1:30 p.m. on March 16, 1983 heading toward a gate at which a flight was about to depart for Miami and the Cayman Islands;

(4) Sadosky was seen at the airport at approximately 2:30 p.m. on March 17, 1983 as he got off a flight that had just arrived from the Cayman Islands, Miami, and Atlanta;

(5) On March 17, 1983, Sadosky appeared very interested in an X-ray machine at an airport security checkpoint even though as an arriving passenger, he did not have to pass through the checkpoint as would a departing passenger;

(6) On March 17, 1983, Sadosky again, according to Agent Olby, behaved nervously and was wearing sunglasses.

(7) On March 17, 1983, during the conversation outside the airport terminal, Sadosky told the agents that he did not have an airline ticket, even though it was known that he just had gotten off an arriving flight.

Based on their knowledge of these facts, the agents reasonably could have suspected that a crime was being committed by Sadosky.

We note that these factual observations of the law enforcement agents are to be viewed as a whole and in light of the familiarity these agents have with the practices of narcotics couriers. *United States v. Wallraff*, 705 F.2d 980, 988–89 (8th Cir. 1983). At the time the described incidents took place, Agent Olby had been a law enforcement officer for six years and had been assigned to work at the Minneapolis-St. Paul Airport for two years. His entire experience was in the area of narcotics investigations. Agent Olby testified that from his experience, a focal point from which narcotics come into the Minneapolis-St. Paul area is the state of Florida. Agent Olby also testified that he had observed other narcotics couriers who wore sunglasses, who behaved in a nervous manner similar to the manner in which Sadosky behaved and who showed an unusual interest in airport security equipment.

Unlike those in *Reid v. Georgia, supra* [hereinafter *Reid*], the facts outlined above, when viewed in light of Agent Olby's experience, most certainly are sufficient to have aroused a reasonable, articulable suspicion that criminal activity was afoot. In *Reid*, because the law enforcement officer had stopped Reid merely on a "hunch" that Reid and another man were trying to conceal the fact that they were traveling together, the stop was held unlawful. 448 U.S. at 441, 100 S.Ct. at 2754. Reid had arrived in Atlanta on a commercial flight from Fort Lauderdale. A DEA agent noticed Reid, who was carrying a shoulder bag, and a second man who was walking somewhat behind Reid and who also was carrying a shoulder bag. The agent observed that as they walked, Reid occasionally looked backward in the direction of the second man. The second man caught up with Reid in the main lobby of the terminal and spoke briefly with Reid. The two men exited the building together. They then were stopped by the agent. *Id.*

at 439, 100 S.Ct. at 2753. The only evidence particularly related to Reid's conduct supporting the agent's decision to make the stop was the fact that Reid occasionally looked over his shoulder at another man who was walking behind him. Under these circumstances the Court held that the stop violated the principles of *Terry. Id.* at 441, 100 S.Ct. at 2754.

Sadosky's case is readily distinguishable from *Reid.* Although Sadosky's nervous behavior on two occasions (which did include looking backward over his shoulder) was a significant factor contributing to a reasonable suspicion of criminal activity, Agent Olby and Officer Mortensen knew much more about Sadosky when they stopped him than the agent in *Reid* knew about his suspects. In this case, the officers knew that Sadosky had given confusing, if not false, information to airline personnel in a lost baggage report. They knew that Sadosky had made a round trip between Minneapolis-St. Paul and Miami or the Cayman Islands in approximately twenty-four hours, and reasonably could infer that Sadosky was deliberately attempting to conceal his recent travel schedule by stating that he did not have an airline ticket. They also had observed Sadosky display an unusual interest in airport security equipment. Unlike the circumstances dealt with in *Reid,* the circumstances here do not "describe a very large category of presumably innocent travelers...." *Id.* at 441, 100 S.Ct. at 2754. Instead, there were sufficient facts related directly to Sadosky's behavior to lead the officers reasonably to suspect him of committing a crime.

Furthermore, we cannot say that the decision to retain Sadosky's bag or the process of filling out a receipt for the bag was unreasonable. In addition to the above facts, by the time Agent Olby told Sadosky that he was going to retain his bag, Sadosky also had denied that he had flown out of the airport on March 16, 1983. Based upon Officer Mortensen's observations, the agents knew this statement to be false. Under these circumstances, *actually* seizing the bag briefly to allow a narcotics dog to sniff it would have been proper. *See*

*Place,* —— U.S. at ——–——, 103 S.Ct. at 2643–44, 77 L.Ed.2d at 120–21. In this case, because of the intervening arrest of Sadosky, the need to make an investigative seizure of the bag, such as that contemplated by *Place,* became unnecessary.

Additionally, this case does not include fact scenarios such as those in *Royer* and *Place* that led the Supreme Court to conclude that the permissible boundaries of a *Terry* stop had been exceeded. Agent Olby and Officer Mortensen stopped Sadosky and talked with him just outside the airport terminal. This lasted only three to four minutes whereupon Sadosky, followed by the officers, went back inside the terminal. Up to this point, neither of the officers had made any attempt to physically seize either Sadosky or his bag. Sadosky then placed a phone call that lasted less than five minutes, after which he immediately was arrested. The issue is whether or not this stop, lasting less than ten minutes, exceeded the limits of reasonableness under the *Terry* line of cases. We hold that it did not.

■ Sadosky also argues that, when they arrested him, the officers did not have probable cause to do so. There is no merit in this contention. "In determining whether probable cause exists to make a warrantless arrest, a court will consider whether the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed or was committing an offense." *United States v. Wallraff,* 705 F.2d at 990. "Probable cause is to be assessed in terms of the circumstances confronting a reasonably cautious police officer at the time of the arrest, and the arresting officer is entitled to consider the circumstances, including arguably innocent conduct, in light of his training and experience." *Id.*

The evidence is that Agent Lewis, a nine-year DEA veteran, arrested Sadosky. Agent Lewis testified that he observed Sadosky for approximately five minutes as Sadosky talked on the airport terminal tele-

phone. Agent Lewis knew, from a brief conversation with Agent Olby, the events that had led Agent Olby and Officer Mortensen to stop Sadosky just outside the airport terminal. When Agent Lewis saw a quick, shiny, white flash as Sadosky transferred something from his bag to his jacket pocket, he immediately went to tell Agent Olby and Officer Mortensen what he had seen. Based upon the officers' collective knowledge, gained through their own observations, Sadosky was arrested. We hold that given the totality of the circumstances at the time of the arrest, it was reasonable to believe that a crime was being committed and that there was probable cause to arrest Sadosky.

We realize that the existence of probable cause in this case depends largely upon the fact that Agent Lewis saw Sadosky take something from his bag and place it in his jacket pocket. Sadosky testified that when he made the transfer he purposefully stood in a manner that would prevent Agent Olby and Officer Mortensen from seeing what he was doing. Sadosky, however, was unaware that at the time he made the transfer Agent Lewis also was observing him. It is reasonable to assume that because he did not know of Agent Lewis's presence, Sadosky was not trying to conceal his actions from Agent Lewis. To rebut Agent Lewis's eyewitness testimony, the defense presented photographic evidence prepared by and testimony of a private investigator in support of Sadosky's position that Agent Lewis could not have seen the transfer take place. In order better to evaluate the evidence on that critical issue of disputed fact, the district court viewed the relevant area inside the Minneapolis-St. Paul Airport terminal. "Our standard of review requires that particular deference be given to the fact-finder, who had the opportunity to observe the testimony and demeanor of both the law enforcement officers and the defendant." *Id.* at 987. We cannot say that the district court erred in finding that Agent Lewis saw Sadosky transfer something from his bag to his jacket pocket.

The conviction is affirmed.