**UNITED STATES of America, Appellee,**

v.

**Helen Faye NUNLEY, Appellant.**

**No. 88–2169.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1989.
Decided April 19, 1989.

Joseph V. Neill, St. Louis, Mo., for appellant.

Daniel E. Meuleman, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before LAY, Chief Judge, and ARNOLD and BOWMAN, Circuit Judges.

ARNOLD, Circuit Judge.

The District Court[1] found Helen Faye Nunley guilty of violating 21 U.S.C. § 841(a)(1) for possessing 83.3 grams of cocaine with intent to distribute, and sentenced her to twenty-one months imprisonment, followed by a three-year term of supervised release. Nunley appeals on three grounds: (1) the Court should have granted her motions to suppress evidence and statements because the drug enforcement agents lacked a reasonable, articulable suspicion to justify approaching and questioning her; (2) the Court erred in holding the Sentencing Guidelines constitutional; and (3) the Court should have adjusted Nunley's base offense level downward to account for her minimal role and her acceptance of responsibility, under Guidelines §§ 3B1.2 and 3E1.1. We affirm.

### I.

On January 21, 1988, members of the Drug Enforcement Administration (DEA) Task Force assigned to St. Louis Lambert International Airport received information from a DEA agent at the Dallas/Fort Worth Airport regarding an individual who had departed from that airport on American Airlines Flight 344, and was suspected of carrying narcotics. DEA agent Timothy Brunholtz, who had seventeen years of experience investigating narcotics traffic, took the call from Dallas/Fort Worth, and relayed to other members of the St. Louis Task Force the following: a woman carrying only a large brown purse had purchased a one-way ticket for Flight 344 with cash shortly prior to departure, and had checked no luggage.

Task Force members Robert Thompson and Hiram Blois, stationed to watch the passengers arriving on Flight 344, noticed Nunley, one of the last passengers to disembark, carrying a large brown purse. They observed Nunley walk very slowly toward the terminal, stopping several times and doubling back in the direction from which she had come, all the while looking about nervously. She passed by the women's rest room, then retraced her steps and entered it. After leaving the rest room, Nunley stood and stared for a few minutes down the concourse at the gate where she had arrived.

As she resumed walking toward the main terminal, Thompson approached her and identified himself as a police officer with the Task Force. Detective Blois remained about five or six feet behind them. Thompson asked if Nunley would agree to speak

---

1. The Hon. Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

with him, and she did. He then asked to see her airline ticket, which she handed to him. When Thompson next asked for identification, Nunley provided her driver's license, but asked why he was questioning her. Thompson replied that, as a member of the narcotics unit, he was attempting to stop the flow of drugs through Lambert Field. Thompson testified that Nunley's "hands began to shake and her voice had a quiver to it." Tr. 15, Pretrial Hearing. Nunley dropped her license as Thompson handed it back to her. Thompson then asked if he could look inside her purse, to which she replied "yes," unzipping it for him. As he looked inside, Thompson observed a plastic bag containing a white, chunky powder he believed to be cocaine. He then arrested Nunley and, rejoined by Detectives Blois and Donna Roussin, the group walked to the DEA office at the airport.

En route, Blois advised Nunley of her constitutional rights, and then read her the *Miranda* warnings again once they reached the office. Nunley responded the first time by saying that she understood her rights. After the second reading, Nunley announced that the purse did not belong to her, she could not remember how she obtained it, she used it only to carry her license, and she did not know how the cocaine got inside it. Thompson performed a field test, confirming the presence of cocaine. After Nunley heard that test result and was again told that she was under arrest, she stated that the purse was hers, she knew about the cocaine, and she was carrying it for her brother, who intended to distribute it. In a later interview with a probation officer, Nunley recanted the statement about her brother, saying instead that she had been delivering the cocaine to someone she had never before seen who was supposed to meet her at the airport.

The District Court denied Nunley's motions to suppress the physical evidence seized from her at the airport and the statements she made subsequent to the seizure, and to declare the Sentencing Guidelines unconstitutional. Nunley waived her rights to trial by jury and to present live testimony and cross-examine witnesses. She agreed to have her case decided by the Court on the basis of a five-page stipulation of facts, while preserving for appeal her challenges to the constitutionality of the search and seizure and the Sentencing Guidelines. The Court found Nunley guilty as charged. It sentenced her to the minimum time provided by the Guidelines for offense level sixteen, twenty-one months incarceration with three years of supervised release. The Court also waived the possible five thousand dollar fine because of Nunley's lack of money, and allowed her to remain free on bond pending this appeal. It decided against reducing Nunley's offense level, as requested, under Guidelines §§ 3B1.2 and 3E1.1.

II.

The District Court properly denied Nunley's motions to suppress the evidence and statements obtained as a result of her encounter with the DEA agents. The conduct of the agents did not exceed the limited restraint permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 As a threshold matter, we agree with the District Court that the encounter amounted to an investigative stop, which must satisfy the *Terry* standard. The initial approach in a public airport by DEA agent Thompson, and his request to speak with Nunley and see her ticket and identification, did not require "some level of objective justification," *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed. 2d 229 (1983) (plurality), because they were elements of a consensual conversation between Nunley and Thompson. *Id.* at 501, 103 S.Ct. at 1326. But as the conversation proceeded, Thompson told Nunley that he was there to stop the flow of drugs through the airport, in response to her query about why he was questioning her. At that point, the "initially consensual encounter between a police officer and a citizen [was] ... transformed into a seizure or detention, ... [since,] 'in view of all the

circumstances surrounding the incident, a reasonable person would have believed that [she] was not free to leave.'" *United States v. Sadosky,* 732 F.2d 1388, 1392 (8th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

Like the detainee in *Sadosky,* Nunley could reasonably believe that the agent's statement indicated that this was more than routine questioning and that she was the particular focus of a narcotics investigation. See *Sadosky, supra,* 732 F.2d at 1392–93. We reached this conclusion in that case despite verbal assurance by the agent that Sadosky was free to go. *Id.* at 1393. The same conclusion is certainly warranted where, as here, no such assurance accompanied the agent's intimidating statement.[2] There is no "litmus-paper test for distinguishing a consensual encounter from a seizure.... [e]ven in the discrete category of airport encounters," *Royer, supra,* 460 U.S. at 506, 103 S.Ct. at 1329. Notwithstanding that, we agree with the District Court that this case involved an investigative stop for which the state must show adequate justification.

 We further agree that the state has met its burden. The information obtained by the St. Louis Airport DEA Task Force in advance of Nunley's arrival—that she had purchased a one-way ticket with cash just minutes before departure and was traveling without baggage—coupled with observations of her nervous state and

erratic movement through the airport as if she was waiting to meet someone or seeking to evade the authorities, provided a sufficient basis to detain Nunley briefly.[3] The "factual observations [of the Task Force members,] ... viewed as a whole and in light of the familiarity these agents have with the practices of narcotics couriers," *Sadosky, supra,* 732 F.2d at 1393, created a reasonable, articulable suspicion that Nunley might be involved in criminal activity. The government rightly relies only on the agents' observations before the investigative stop began. It does not argue that Nunley's reactions after Thompson explained his mission (e.g., her shaking hands or quivering voice) helped establish a reasonable suspicion.[4] Nor does the government mechanically apply the "drug courier profile" to justify the stop. See *Royer, supra,* 460 U.S. at 526 n. 6, 103 S.Ct. at 1339 n. 6 (Rehnquist, J., dissenting). Thompson testified that consideration of the profile "might have been incidental to it, but it wasn't the core of the arrest." Tr. 22, Pretrial Hearing.

The intrusiveness of the encounter must be judged from the perspective of an innocent person similarly confronted. See *United States v. Wylie,* 569 F.2d 62, 68 (D.C.Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). It is certainly possible that someone not connected in any way to narcotics traffic could purchase a one-way ticket with cash at the last moment, check no bags, and behave in the nervous and erratic manner that Nun-

2. An agent does not have to inform a detainee that he or she may leave or otherwise refuse consent. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 234, 93 S.Ct. 2041, 2047, 2051 (1973). But the absence of such notice contributes to the reasonable perception that a detainee is being restrained. See *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326. See also *United States v. Miller,* 835 F.2d 187, 189 (8th Cir.1987), and *United States v. Pantazis,* 816 F.2d 361, 362 (8th Cir.1987). In the first of these cases, the officer told Miller that he was not under arrest, and in the second, the officer notified Pantazis that he was not under arrest and was free to go. In both, we concluded that a consensual conversation not triggering Fourth Amendment concerns had occurred.

3. In *United States v. Campbell,* 843 F.2d 1089, 1094–95 (8th Cir.1988), we held that a reasonable, articulable suspicion existed where the traveler appeared nervous while walking very quickly through the airport and looking over his shoulder at least three times, he was wearing a winter coat in late July, he was traveling from a "source city" with just a carry-on bag, and he purchased his one-way ticket with cash. Although Nunley was not coming from a recognized source city or wearing attire inappropriate to the weather, she was traveling without any luggage whatsoever, and she purchased her ticket just moments before departure.

4. Refusal to listen or answer would not furnish the basis for detention either. *Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324.

ley did upon arrival. However, as in *Sadosky*, "the circumstances here do not 'describe a very large category of presumably innocent travelers....'" *Sadosky, supra,* 732 F.2d at 1394 (distinguishing *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980), which held that no reasonable suspicion existed where only unusual circumstance was that Reid occasionally looked over his shoulder at another man who was walking behind him).

■ Moreover, the brief detention of Nunley did not exceed the limits necessary to make the stop. Agent Thompson used no physical restraint, he conducted his questioning in a public area in the airport, without requesting that Nunley follow him to a separate room, and he returned her license. The detention occurred after Nunley reached her destination, so there was no risk of her missing a scheduled airplane flight. We recognize that the encounter with an officer may have seemed more threatening to Nunley, a 23–year–old with a "lack of education" (Tr. 11, Sentencing Hearing). Yet, "[w]hile these factors [are] not irrelevant, see *Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047, neither [are] they decisive...." *Mendenhall, supra,* 446 U.S. at 558, 100 S.Ct. at 1879 (opinion of Stewart, J.).[5]

### III.

■ We also affirm the judgment of the District Court with respect to the constitutionality of the Federal Sentencing Guidelines and their application in Nunley's case. The Supreme Court, in *United States v. Mistretta,* — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), rejected the arguments that the Guidelines violate the separation-of-powers principle and involve an unlawful delegation of authority. *Mistretta* did not address the due-process challenge raised by Nunley—that the Guidelines violate the Due Process Clause because they eliminate judges' sentencing discretion—but a panel of this Court has recently considered and rejected this sort of challenge. In *United*

*States v. Brittman,* 872 F.2d 827 (8th Cir. 1989), we held that the Due Process Clause of the Fifth Amendment does not, in non-capital cases, guarantee a sentencing regime under which courts have discretion to tailor sentences to individual offenders and their circumstances.

We therefore hold that the Sentencing Guidelines are not facially unconstitutional on delegation, separation-of-powers, or due-process grounds. This holding does not foreclose due-process challenges to the Guidelines as applied in individual cases—for example, that they are being applied without giving defendants an appropriate opportunity to contest the facts bearing upon the various predicate factors that the Guidelines make relevant to sentencing. No such questions are before us in the present case, and we express no view on them.

As for Nunley's two challenges to the District Court's application of the Guidelines, neither is persuasive. Nunley argues that the Court should have reduced her base offense level in light of her role as a "minimal participant" and her acceptance of responsibility.

■ For the first of these arguments, she cites Guidelines § 3B1.2(a), which permits a decrease by four offense levels if a defendant played a minimal role in the concerted criminal activity of a group of individuals. The commentary for this section explains: "It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, ... in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." Sentencing Guidelines § 3B1.2 commentary at 3.4.

Nunley told the officers that she was carrying the cocaine for her brother, who intended to distribute it, and then she offered a different explanation—that she was

---

**5.** There is no indication in the record that Nunley was aware of the other DEA agents who

were ready to assist Thompson.

bringing the drugs to an unknown party in exchange for a one-way ticket to St. Louis. Her behavior as she walked from the gate through the airport supports her claim that she was expecting to meet someone, perhaps someone she had never before seen. Nevertheless, her references to other participants were vague, and the sentencing judge was not clearly erroneous in concluding, "as far as the evidence before me, ... it was just her, there's no one else that I know of that's involved in this matter other than by some conjecture on my part." Tr. 31, Sentencing Hearing.

Nunley also argued unsuccessfully to the sentencing judge that her offense level should be adjusted downward by two levels according to Guidelines § 3E1.1(a), which applies to defendants who "clearly [demonstrate] a recognition and affirmative acceptance of personal responsibility for the offense of conviction...." It is true that Nunley ultimately said that the purse was hers and that she was knowingly carrying the cocaine for distribution, but she first feigned ignorance about the narcotics. She did not voluntarily terminate her illegal conduct or surrender herself to authorities before her arrest.

Furthermore, language in the Memorandum of Agreement signed by Nunley and by the Assistant United States Attorney, that "the Defendant does acknowledge and accept personal responsibility for her conduct in accordance with Guidelines Section 3E1.1" (No. 88–27 CR(2), March 21, 1988), does not bind the sentencing court.[6] A stipulation that Nunley accepts responsibility is not enough by itself to trigger § 3E1.1(a) when even a plea of guilty would not entitle a defendant to sentence reduction as a matter of right. Guidelines § 3E1.1(c).[7]

The commentary to § 3E1.1 expressly reminds us that "[t]he sentencing judge is in a unique position to evaluate the defen-

dant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless without foundation." Accordingly, we uphold the sentence imposed by the District Court.

Affirmed.

---

6. We reject the government's argument that this language was merely an expression of Nunley's position, rather than a matter of substantive agreement between the defendant and the prosecution. The issue of her acceptance of responsibility is still for the court, not the prosecution, to resolve.

7. The judge was careful not to hold against Nunley the fact that she did not plead guilty. Tr. 29, Sentencing Hearing.