UNITED STATES of America, Appellee,

v.

James A. McKINES, Appellant.

No. 89-2920.

United States Court of Appeals, Eighth Circuit.

Submitted April 9, 1990.

Decided Oct. 26, 1990.

Elven Bauman, Belton, Mo., for appellant.

Mark Miller, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before LAY, Chief Judge, MAGILL and BEAM, Circuit Judges.

LAY, Chief Judge.

This is an airport search case. On June 8, 1989, James A. McKines arrived at the Kansas City International Airport on an early morning flight from Las Vegas. Special Agent Carl Hicks of the Drug Enforcement Agency (DEA) routinely watched that flight because previous passengers on it had been caught transporting drugs. Hicks was assisted by Detectives Paul Carrill and Tully Kessler of the Platte County Sheriff's Office. They were all dressed in plain clothes. McKines caught Hicks' attention as he was deplaning because his rough clothes were casual and crumpled, he was not wearing socks, he had a beard, was wearing sunglasses, and did not appear to be a businessman, a student, or in the military service. Although the agents had no information that McKines was carrying drugs, they felt he looked suspicious and decided to watch him. They watched McKines make a phone call upon entering the terminal. They then followed

him to the baggage claim area where McKines went to the rear of the carousel so he could see the entire terminal. He looked around, retrieved two suitcases, and walked outside toward a taxi stand. Hicks decided to approach McKines outside the terminal. The other two detectives followed at a distance. Hicks told McKines he was a police officer and asked if he could talk to him. McKines consented. After asking McKines where he was going, Hicks asked to see his plane ticket. Hicks noticed that it had been purchased with cash and that it was a round trip ticket with a return date three days later. The ticket was in the name of "John" McKines. Hicks returned the ticket and asked McKines for some identification. McKines handed Hicks a driver's license in the name of "James" McKines. Hicks also noticed that McKines' luggage had tags with the name of "John" McKines. After returning the license to McKines and questioning him about the name difference, Hicks told him that he was a Special Agent with the DEA and that he was watching for drugs. He asked McKines if he had any drugs in his suitcases, McKines stated that he did not. Hicks asked McKines if he could look into his suitcases and McKines consented. Because it was crowded outside on the sidewalk, Hicks asked McKines if they could step inside out of the way. McKines agreed and they moved into an empty alcove right inside the terminal. Hicks opened the smallest suitcase and found only men's clothing. Hicks then asked permission to open the large suitcase. McKines consented and opened the suitcase himself. The larger suitcase, which McKines said was not his but belonged to a friend, contained, among other things, an eight-pack of bottles of Mountain Dew. Hicks thought he smelled liquid Phencyclidine (PCP) but could not tell from where it was emanating since the bottles appeared to be sealed. Since he had found nothing, Hicks repacked the suitcase and McKines walked away toward the taxi stand. De-

tective Kessler approached Hicks from where he and Detective Carrill had been standing about ten feet away and asked what was in the bottles. Hicks told him they had contained Mountain Dew. Kessler told Hicks that he drank Mountain Dew and that it had not looked like Mountain Dew to him. He also told Hicks that he knew that a method had been developed of resealing bottles. Hicks decided to check the bottles again. He went outside the terminal, found McKines seated in a taxi, and asked him if he could search the large suitcase again. McKines consented again, got out of the taxi, and unlocked the suitcase for Hicks. Hicks opened one of the bottles and found that it contained liquid PCP. They arrested McKines. McKines has always contended that he did not know that the bottles contained PCP and that he was delivering the suitcase for a friend. He was convicted and received a mandatory life term based on two prior drug convictions concerning PCP.[1]

On appeal, McKines initially challenges the ruling of the district court that the search violated the Fourth Amendment. The district court, relying on the magistrate's determination, found that there was no "seizure" and that the search was a consensual one. We agree and affirm the conviction.

It is conceded that there was no probable cause for the search. In addition it is clear that when McKines was approached and was told that the agents suspected that he was carrying drugs there existed no articulable suspicion for a "stop and frisk" search under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The issue then arises as to whether there was an illegal seizure under the Fourth Amendment when Hicks approached McKines and asked if he could look in his luggage because he suspected McKines of carrying drugs.

This issue turns on whether, at this point, a reasonable person would feel

---

1. The two prior convictions subjecting McKines to the enhanced penalty provisions of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (1988), were for possession of a controlled substance with intent to sell Pyrrolidine (a PCP analog) in 1982, and in 1986, for possession of PCP for sale. Appellee's Brief at 11.

that he or she was no longer free to leave. As the magistrate related, not all questioning of an individual must be construed as a seizure. *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Campbell,* 843 F.2d 1089, 1092 (8th Cir. 1988). Consent or coercion is determined by the totality of the circumstances because consent will validate a search unless it is vitiated by the investigatory procedures of the police. Consent is a question of fact for the trial court and that finding will be reversed only if it is clearly erroneous. *United States v. Drinkard,* 900 F.2d 140, 144 (8th Cir.1990).[2] A person is "seized" only when a reasonable person would feel that he or she is not free to leave. *United States v. Sadosky,* 732 F.2d 1388, 1392 (8th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984). We find nothing in the record to indicate that McKines was in any way restrained, which would indicate that he was not free to leave, or coerced, which would indicate he could not refuse to consent to a search. It is true the officers did not inform him that he was free to leave or could refuse to consent to the search but this is not a sine qua non of a lawful arrest and a finding of a consensual search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Nunley,* 873 F.2d 182, 185 n. 2 (8th Cir.1989). We hold that there was not a seizure under the Fourth Amendment.

■ After the first search, McKines did in fact leave. He was next approached by Hicks while he was sitting in the taxi. Once again, he consented to a search after a simple request. There was no coercion by means of physical force or by show of authority. Demonstrative of McKines' voluntary consent was his testimony that he knew he could have refused to allow Hicks to search the suitcase. (Tr. at 90). It is a strain under these facts to find that the consent given was coercive or involuntary. *See Campbell,* 843 F.2d at 1095–96. We find that there is substantial evidence to support the district court's determination that McKines voluntarily consented to the search and that this determination was not clearly erroneous.

■ McKines also argues that the court should not have admitted evidence of his two prior drug convictions because they were more prejudicial than probative and that his mandatory life sentence without parole violates the Eighth Amendment. We find no merit in these arguments. We agree the sentence is extremely severe. However, Congress, in its legislative wisdom, has provided for enhanced punishment, under the Anti–Drug Abuse Act of 1986, for persons convicted under 21 U.S.C. § 841(a)(1), (b)(1)(A) (1988) who have had previous narcotics convictions.[3] Persons in this category bear the risk of knowing that their sentence may be enhanced, resulting in a life sentence without parole. *United States v. Collado–Gomez,* 834 F.2d 280, 281 (2d Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). The enhanced penalty is rationally related to Congress' purpose of deterring a particularly insidious form of narcotics transactions. *Id.* Due process is not violated by

**2.** This case is clearly distinguishable from *Drinkard.* In *Drinkard,* the DEA agents were relying on an informant's tip that Drinkard's traveling companion would be bringing drugs into the airport. Drinkard was surrounded by DEA agents and there was more than one request for information, he was asked if he had drugs, and if the agents could search his luggage. The court found on these facts that Drinkard was not free to leave. *Drinkard,* 900 F.2d at 144. These facts do not exist here. In *Drinkard,* the panel stated that if it were sitting on the case de novo it might have found that the consent was involuntary. *Id.* However, it relied on the factual determination of the trial court that there was a consensual search and found that there was substantial evidence to support this conclusion. *Id.*

**3.** The Anti–Drug Abuse Act of 1988 amended section 841(b)(1)(A) to provide that a person convicted under section 841(a)(1) faces a mandatory minimum of 10 years to life in prison. The penalty is increased to a mandatory minimum of 20 years to life for one previous drug conviction and for two previous drug convictions the penalty is a mandatory life term without parole. *Id.* A sentence imposed under this subsection may not be suspended or paroled. *Id.*

this purpose or by allocating the risk to persons with multiple drug convictions.

 The life term without parole imposed on McKines does not constitute cruel and unusual punishment. In analyzing the proportionality of McKines' penalty with his crime we have considered several factors. The offense he committed is very serious. Congress has proven how strongly it feels about drug offenses by enhancing the penalty for repeat offenders. While the penalty is harsh, the offender bears the risk of receiving this penalty by continuing to traffic in drugs. Congress has reserved life sentences for serious offenses and by amending section 841(b)(1)(A) to include a mandatory life sentence has clearly shown us it considers repeat drug offenses to be serious crimes. The government has a significant interest in isolating these repeat offenders. *Solem v. Helm,* 463 U.S. 277, 296, 103 S.Ct. 3001, 3012, 77 L.Ed.2d 637 (1983).[4] For these reasons we hold that a mandatory life sentence for a third conviction for drug trafficking is not cruel and unusual punishment under the Eighth Amendment.

Judgment affirmed.

BEAM, Circuit Judge, concurring.

I concur with the result reached in this case. I write separately to suggest that *United States v. Drinkard,* 900 F.2d 140 (8th Cir.1990) cannot be so easily distinguished as stated in footnote 2 of the opinion. *Ante* at 1080 n. 2. This circuit has birthed, in addition to *Drinkard,* at least a brace of other cases which can be interpreted to stand for the proposition that the second showing of a badge coupled with the announcement that illegal drug commerce is the subject of the encounter transforms the detention into a stop contemplated by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Condelee,* 915 F.2d 1206 (8th Cir.1990); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990). In my view, *Drinkard, Condelee,* and *Millan* are at odds with the holdings in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In *Mendenhall* and *Royer,* the Supreme Court expressly declined to do what this circuit has done in the three cited cases, that is, adopt a litmus test for such fourth amendment seizures.

In *Mendenhall,* the Supreme Court reversed the conclusion of the court of appeals that Mendenhall's conviction had been obtained in violation of the fourth amendment.[1] Agents of the DEA stopped Mendenhall in the airport concourse, identified themselves as federal agents, asked to see her identification and her plane ticket, noted discrepancies between the two, and then one agent specifically identified himself as a federal narcotics agent. *Mendenhall,* 446 U.S. at 547–48, 100 S.Ct. at 1873. The officers asked Mendenhall to accompany them up a flight of stairs to the DEA's airport office, where Mendenhall consented to a search of her person. On these facts, the opinion of Justice Stewart found no fourth amendment seizure. By definition, "a person has been 'seized' within the

---

**4.** The Supreme Court in *Solem,* did mention the possibility that life sentences for repeat drug offenders might be constitutional, however, the question was not before the Court. *Solem,* 463 U.S. at 299 n. 26, 103 S.Ct. at 3014 n. 26.

**1.** The Supreme Court was oddly divided in *Mendenhall.* Justice Stewart wrote the opinion of the Court, in which only Justice Rehnquist fully joined. Justice Stewart's opinion was also partially joined by Chief Justice Burger and Justices Blackmun and Powell, but these justices did not necessarily concur in Justice Stewart's conclusion that no fourth amendment seizure occurred. *Mendenhall,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1873 n. 1 (Powell, J., concurring in part and concurring in the judgment). Rather, they concluded, in an opinion by Justice Powell, that, assuming that a fourth amendment seizure occurred, it was supported by reasonable suspicion. Because Justices Stewart and Rehnquist found no seizure, they did not reach the issue of reasonable suspicion. Thus, Justice White wrote in dissent that the Court's conclusion that the agents had acted lawfully was "particularly curious because a majority of the Members of the Court refuse to reject the conclusion that Ms. Mendenhall was 'seized,' while a separate majority decline to hold that there were reasonable grounds to justify a seizure." *Id.* at 566, 100 S.Ct. at 1883 (White, J., dissenting).

meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877. The court continued by setting forth several illustrative circumstances in which a fourth amendment seizure might occur.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* Thus, even though an officer specifically identified himself as a drug enforcement agent, thereby making Mendenhall aware that she was the focus of a drug investigation, Justice Stewart found no fourth amendment seizure. Yet it is this focus upon which the Eighth Circuit cases now rely, and not on the illustrative factors set forth by the Supreme Court. Significantly, none of these factors exist in this or our other cited cases.

In *Royer*,[2] the Supreme Court affirmed the conclusion of the Florida District Court of Appeal that Royer had been illegally detained and that the search of his luggage was tainted by the illegal detention. Royer was stopped at the airport by state narcotics investigators who identified themselves as police officers, asked to see Royer's plane ticket and driver's license, and then informed him that they were, specifically, narcotics investigators with reason to suspect him of drug trafficking. *Royer*, 460 U.S. at 493–94, 103 S.Ct. at 1321–22. The officers then asked Royer to accompany them to a room, which the Court characterized as a large storage closet, in which Royer consented to the search of his luggage. *Id.* at 494–95, 103 S.Ct. at 1322. The Supreme Court found a fourth amendment seizure "when the officers identified

themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart." *Id.* at 501, 103 S.Ct. at 1326.

Were *Mendenhall* and *Royer* definitive that a fourth amendment seizure occurs when an officer identifies himself as a federal narcotics agent and informs the defendant that he is under investigation, our cases could draw support from them for their conclusion. To the contrary, however, *Mendenhall* and *Royer* reach different conclusions even though the agents in both cases identified themselves as federal narcotics agents. Simply put, these cases do not require the conclusions drawn in our cases. Indeed, the illustrative factors cited in *Mendenhall* suggest a contrary result. In *Mendenhall*, for instance, the Court suggested that the "threatening presence of several officers" might indicate a fourth amendment seizure. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. By contrast, while several officers were present in *Drinkard*, it is not at all clear that Drinkard even knew of their presence. Also, the court in *Drinkard* does not indicate that their presence was in any way "threatening."

As indicated, while *Royer* does rely in part on the focus on a particular defendant which our cases find definitive, *Royer* cannot be read so narrowly. We should not discount the importance of the fact in *Royer* that defendant was taken to a large closet and interrogated therein, a fact which both dissenters in *Royer* commented on. *Royer*, 460 U.S. at 517 and n. 2, 103 S.Ct. at 1334 and n. 2 (Blackmun, J., dissenting); *id.* at 532 and n. 10, 103 S.Ct. at 1342 and n. 10 (Rehnquist, J., dissenting). Thus, while the Court in *Royer* found a seizure partly because "the officers identified themselves as narcotics agents, [and] told Royer that he was suspected of trans-

---

2. Only a plurality in *Royer* concluded that a fourth amendment seizure occurred. Rather than diminishing the importance of these cases, however, the fractured nature of the Court in *Royer* and *Mendenhall* indicates the difficulties inherent in fourth amendment analysis, and the inappropriateness of the facile "test" this circuit is in effect adopting.

porting narcotics," *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326, the Court also relied on the agents' request that Royer follow them to a police room while they retained his identification and plane ticket. By contrast, the defendants in none of our cases were taken to a police room while the agents retained identification and plane tickets. *See id.* The difference should not be slighted, for the Court concluded that a reasonable person in Royer's place would not have felt free to leave only with reference to *all* of the circumstances, including detention in the police room. *See id.* at 501–02, 103 S.Ct. at 1326. Given that the Court had already noted that "the fact that the officer identifies himself as a police officer, without more, [would not] convert the encounter into a seizure," *id.* at 497, 103 S.Ct. at 1324, this factor, not present in our cases, seems especially significant.

In short, our cases effectively do what the Supreme Court in *Royer* warned against:

> We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.

*Royer*, 460 U.S. at 506–07, 103 S.Ct. at 1329. These airport-stop drug cases involve difficult factual questions with which district courts often struggle in suppression hearings. Their conclusions should not be overturned as clearly erroneous on the basis of a few factors, drawn not from Supreme Court jurisprudence but from a few circuit cases, and reduced to a sentence or a paragraph, which masquerade as a "rule that will provide unarguable answers." *Id.* Given our cases, it is my view

that it is time for this circuit to reconsider this issue en banc.